**In the Matter of BABY K.**

**Civ. A. No. 93–68–A (filed under seal).**

United States District Court,
E.D. Virginia,
Alexandria Division.

July 1, 1993.

Julia Claire Krebs–Markrich, Hazel & Thomas, Falls Church, VA, for plaintiff.

Alison Paige Landry, Dept. for the Rights of Virginians w/Disabilities, Richmond, VA, Pleasant Sanford Brodnax, III, Alexandria, VA, Debra Ann Palmer, Covington & Burling, Washington, DC, Kenneth E. Labowitz, Young & Goldman, Alexandria, VA, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HILTON, District Judge.

This case was tried before the court, and upon the evidence presented and argument of counsel, the court makes the following Findings of Fact and Conclusions of Law.

### Findings of Fact

1. Plaintiff Hospital is a general acute care hospital located in Virginia that is licensed to provide diagnosis, treatment, and medical and nursing services to the public as provided by Virginia law. Among other facilities, the Hospital has a Pediatric Intensive Care Department and an Emergency Department.

2. The Hospital is a recipient of federal and state funds including those from Medicare and Medicaid and is a "participating hospital" pursuant to 42 U.S.C. § 1395cc.

3. The Hospital and its staff (including emergency doctors, pediatricians, neonatologists and pediatric intensivists) treat sick children on a daily basis.

4. Defendant Ms. H, a citizen of the Commonwealth of Virginia, is the biological mother of Baby K, an infant girl born by Caesare-

an section at the Hospital on October 13, 1992. Baby K was born with anencephaly.

5. Anencephaly is a congenital defect in which the brain stem is present but the cerebral cortex is rudimentary or absent. There is no treatment that will cure, correct, or ameliorate anencephaly. Baby K is permanently unconscious and cannot hear or see. Lacking a cerebral function, Baby K does not feel pain. Baby K has brain stem functions primarily limited to reflexive actions such as feeding reflexes (rooting, sucking, swallowing), respiratory reflexes (breathing, coughing), and reflexive responses to sound or touch. Baby K has a normal heart rate, blood pressure, liver function, digestion, kidney function, and bladder function and has gained weight since her birth. Most anencephalic infants die within days of birth.

6. Baby K was diagnosed prenatally as being anencephalic. Despite the counselling of her obstetrician and neonatologist that she terminate her pregnancy, Ms. H refused to have her unborn child aborted.

7. A Virginia court of competent jurisdiction has found defendant Mr. K, a citizen of the Commonwealth of Virginia, to be Baby K's biological father.

8. Ms. H and Mr. K have never been married.

9. Since Baby K's birth, Mr. K has, at most, been only distantly involved in matters relating to the infant. Neither the Hospital nor Ms. H ever sought Mr. K's opinion or consent in providing medical treatment to Baby K.

10. Because Baby K had difficulty breathing immediately upon birth, Hospital physicians provided her with mechanical ventilator treatment to allow her to breathe.

11. Within days of Baby K's birth, Hospital medical personnel urged Ms. H to permit a "Do Not Resuscitate Order" for Baby K that would discontinue ventilator treatment. Her physicians told her that no treatment existed for Baby K's anencephalic condition, no therapeutic or palliative purpose was served by the treatment, and that ventilator care was medically unnecessary and inappropriate. Despite this pressure, Ms. H continued to request ventilator treatment for her child.

12. Because of Ms. H's continued insistence that Baby K receive ventilator treatment, her treating physicians requested the assistance of the Hospital's "Ethics Committee" in overriding the mother's wishes.

13. A three person Ethics Committee subcommittee, composed of a family practitioner, a psychiatrist, and a minister, met with physicians providing care to Baby K. On October 22, 1992, the group concluded that Baby K's ventilator treatment should end because "such care is futile" and decided to "wait a reasonable time for the family to help the caregiver terminate aggressive therapy." If the family refused to follow this advice, the committee recommended that the Hospital should "attempt to resolve this through our legal system."

14. Ms. H subsequently rejected the committee's recommendation. Before pursuing legal action to override Ms. H's position, the Hospital decided to transfer the infant to another health care facility.

15. Baby K was transferred to a nursing home ("Nursing Home") in Virginia on November 30, 1992 during a period when she was not experiencing respiratory distress and thus did not need ventilator treatment. A condition of the transfer was that the Hospital agreed to take the infant back if Baby K again developed respiratory distress to receive ventilator treatment which was unavailable at the Nursing Home. Ms. H agreed to this transfer.

16. Baby K returned to the Hospital on January 15, 1993 after experiencing respiratory distress to receive ventilator treatment. Hospital officials again attempted to persuade Ms. H to discontinue ventilator treatment for her child. Ms. H again refused. After Baby K could breathe on her own, she was transferred back to the Nursing Home on February 12, 1993.

17. Baby K again experienced breathing difficulties on March 3, 1993 and returned to the Hospital to receive ventilator treatment.

18. On March 15, 1993, Baby K received a tracheotomy, a procedure in which a

breathing tube is surgically implanted in her windpipe, to facilitate ventilator treatment. Ms. H agreed to this operation.

19. After no longer requiring ventilator treatment, Baby K was transferred back to the Nursing Home on April 13, 1993 where she continues to live.

20. Baby K will almost certainly continue to have episodes of respiratory distress in the future. In the absence of ventilator treatment during these episodes, she would suffer serious impairment of her bodily functions and soon die.

21. Ms. H visits Baby K daily. The mother opposes the discontinuation of ventilator treatment when Baby K experiences respiratory distress because she believes that all human life has value, including her anencephalic daughter's life. Ms. H has a firm Christian faith that all life should be protected. She believes that God will work a miracle if that is his will. Otherwise, Ms. H believes, God, and not other humans, should decide the moment of her daughter's death. As Baby K's mother and as the only parent who has participated in the infant's care, Ms. H believes that she has the right to decide what is in her child's best interests.

22. On the Hospital's motion, a guardian *ad litem* to represent Baby K was appointed pursuant to Virginia Code § 8.01–9.

23. Both the guardian *ad litem* and Mr. K share the Hospital's position that ventilator treatment should be withheld from Baby K when she experiences respiratory distress.

24. The Hospital has stipulated that it is not proposing to deny ventilator treatment to Baby K because of any lack of adequate resources or any inability of Ms. H to pay for the treatment.

### Conclusions of Law

Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, the Hospital has sought declaratory and injunctive relief under four federal statutes and one Virginia statute: the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd; the Rehabilitation Act of 1973, 29 U.S.C. § 794; the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.*; the Child

Abuse Amendments of 1984, 42 U.S.C. § 5102 *et seq.*; and the Virginia Medical Malpractice Act, Va.Code § 8.01–581.1 *et seq.* This court has federal question jurisdiction under the four federal statutes and supplemental jurisdiction regarding the Virginia statute. 28 U.S.C. §§ 1331, 1367.

### I. Emergency Medical Treatment and Active Labor Act

■ Plaintiff seeks a declaration that its refusal to provide Baby K with life-supporting medical care would not transgress the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd ("EMTALA"). EMTALA requires that participating hospitals provide stabilizing medical treatment to any person who comes to an emergency department in an "emergency medical condition" when treatment is requested on that person's behalf. An "emergency medical condition" is defined in the statute as "acute symptoms of sufficient severity ... such that the absence of immediate medical attention could reasonably be expected to result in ... serious impairment to bodily functions, or serious dysfunction of any bodily organ or part." 42 U.S.C. § 1395dd(e)(1)(A). "Stabilizing" medical treatment is defined as "such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition" will result. *Id.* § 1395dd(e)(3)(A). The statute's legislative history includes a position paper by the American College of Emergency Physicians stating that "stabilization" should include "[e]stablishing and assuring an adequate airway and adequate ventilation." H.R.Rep. No. 241 (Pt. 3), 99th Cong., 1st Sess. 26 (1985).

The Hospital admits that Baby K would meet these criteria if she is brought to the Hospital while experiencing breathing difficulty. As stated in the Hospital's complaint, when Baby K is in respiratory distress, that condition is "such that the absence of immediate medical attention could reasonably be expected to cause serious impairment to her bodily functions"—*i.e.*, her breathing difficulties constitute an "emergency medical condition." The Hospital also concedes in its com-

plaint that ventilator treatment is required in such circumstances to assure "that no material deterioration of Baby K's condition is likely to occur"—*i.e.,* a ventilator is necessary to "stabilize" the baby's condition. These admissions establish that the Hospital would be liable under EMTALA if Baby K arrived there in respiratory distress (or some other emergency medical condition) and the Hospital failed to provide mechanical ventilation (or some other medical treatment) necessary to stabilize her acute condition.

The Hospital would also have an obligation to continue to provide stabilizing medical treatment to Baby K even if she were admitted to the pediatric intensive care unit or other unit of the Hospital and to provide the treatment until she could be transferred back to the Nursing Home or to another facility willing to accept her. *See Thornton v. Southwest Detroit Hosp.,* 895 F.2d 1131, 1135 (6th Cir.1990) ("emergency care does not always stop when a patient is wheeled from the emergency room into the main hospital"); *McIntyre v. Schick,* 795 F.Supp. 777, 781 (E.D.Va.1992) (rationale behind "anti-dumping statute is not based upon the door of the hospital through which a patient enters, but rather upon the notion of proper medical care for those persons suffering medical emergencies, whenever such emergencies occur at a participating hospital. Indeed, it is. a ridiculous distinction, one which places form over substance, to state that the care a patient receives depends on the door through which the patient walks").

Despite EMTALA's clear requirements and in the face of the Hospital's admissions, the Hospital seeks an exemption from the statute for instances in which the treatment at issue is deemed "futile" or "inhumane" by the hospital physicians. The plain language of the statute requires stabilization of an emergency medical condition. The statute does not admit of any "futility" or "inhumanity" exceptions. Any argument to the contrary should be directed to the U.S. Congress, not to the Federal Judiciary. *Cf. Baber v. Hospital Corporation of America,* 977 F.2d 872, 878 (4th Cir.1992) (rejecting argument that EMTALA provides private cause of action against physicians on grounds that

"it is not our role to rewrite legislation passed by Congress. When a statute is clear and unambiguous, we must apply its terms as written instead of varying its terms to accommodate a perceived legislative intent").

Even if EMTALA contained the exceptions advanced by the Hospital, these exceptions would not apply here. The use of a mechanical ventilator to assist breathing is not "futile" or "inhumane" in relieving the *acute* symptoms of respiratory difficulty which is the emergency medical condition that must be treated under EMTALA. To hold otherwise would allow hospitals to deny emergency treatment to numerous classes of patients, such as accident victims who have terminal cancer or AIDS, on the grounds that they eventually will die anyway from those diseases and that emergency care for them would therefore be "futile."

## II. Rehabilitation Act

 Section 504 of the Rehabilitation Act prohibits discrimination against an "otherwise qualified" handicapped individual, solely by reason of his or her handicap, under any program or activity receiving federal financial assistance. Hospitals such as plaintiff that accept Medicare and Medicaid funding are subject to the Act. *United States v. Baylor Univ. Medical Center,* 736 F.2d 1039, 1049 (5th Cir.1984), *cert. denied,* 469 U.S. 1189, 105 S.Ct. 958, 83 L.Ed.2d 964 (1985). Baby K is a "handicapped" and "disabled" person within the meaning of the Rehabilitation Act of 1973. A "handicapped individual" under the Rehabilitation Act "includes an infant who is born with a congenital defect." *Bowen v. American Hospital Ass'n,* 476 U.S. 610, 624, 106 S.Ct. 2101, 2110, 90 L.Ed.2d 584 (1986).

 Section 504's plain text spells out the necessary scope of inquiry: Is Baby K otherwise qualified to receive ventilator treatment and is ventilator treatment being threatened with being denied because of an unjustified consideration of her anencephalic handicap? The Hospital has admitted that the sole reason it wishes to withhold ventilator treatment for Baby K over her mother's objections, is because of Baby K's anencephaly—her handicap and disability.

To evade this textual mandate, the Hospital relies on two cases which held that a hospital's decision not to override the desire of the parents of babies with congenital defects to withhold treatment did not violate section 504. *Johnson v. Thompson*, 971 F.2d 1487, 1493 (10th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1255, 122 L.Ed.2d 654 (1993); *United States v. University Hospital, State U. of New York*, 729 F.2d 144, 156–57 (2d Cir.1984). Because the parents in *Johnson* and *University Hospital* consented to the withholding of treatment, the two cases are factually distinguishable from this case.[1]

When the Rehabilitation Act was passed in 1973, Congress intended that discrimination on the basis of a handicap be treated in the same manner that Title VI of the Civil Rights Act treats racial discrimination. *University Hospital*, 729 F.2d at 161–163 (Winter, J., dissenting). This analogy to race dispels any ambiguity about the extent to which Baby K has statutory rights not to be discriminated against on the basis of her handicap. It also shatters the Hospital's contention that ventilator treatment should be withheld because Baby K's recurring breathing troubles are intrinsically related to her handicap. No such distinction would be permissible within the context of racial discrimination. In addition, the Hospital was able to perform a tracheotomy on Baby K. This surgery was far more complicated than linking her to a ventilator to allow her to breathe. *Cf. Bowen*, 476 U.S. at 655, 106 S.Ct. at 2127 ("if an otherwise normal child would be given the identical treatment, so should the handicapped child") (White, J., dictum in dissent). Just as an AIDS patient seeking ear surgery is "otherwise qualified" to receive treatment despite poor long term prospects of living, Baby K is "otherwise qualified" to receive ventilator treatment despite similarly dismal health prospects. *Cf. Glanz v. Vernick*, 750 F.Supp. 39, 45–46 (D.Mass.1990). Thus, the Hospital's desire to withhold ventilator treatment from Baby

K over her mother's objections would violate the Rehabilitation Act.

### III. Americans with Disabilities Act

■ Section 302 of the Americans with Disabilities Act ("ADA") prohibits discrimination against disabled individuals by "public accommodations." 42 U.S.C. § 12182. A "disability" is "a physical or mental impairment that substantially limits one or more of the major life activities" of an individual. 42 U.S.C. § 12102(2). This includes any physiological disorder or condition affecting the neurological system, musculoskeletal system, or sense organs, among others. 28 C.F.R. § 36.104 (definition of "physical or mental impairment"). Anencephaly is a disability, because it affects the baby's neurological functioning, ability to walk, and ability to see or talk. "Public accommodation" is defined to include a "professional office of a health care provider, hospital, or other service establishment." 42 U.S.C. § 12181(7). The Hospital is a public accommodation under the ADA. 28 C.F.R. § 36.104.

■ Section 302(a) of the ADA states a general rule of nondiscrimination against the disabled:

> General rule. No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodation of any place of public accommodations by any person who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C. § 12182(a). In contrast to the Rehabilitation Act, the ADA does not require that a handicapped individual be "otherwise qualified" to receive the benefits of participation. Further, section 302(b)(1)(A) of the ADA states that "[i]t shall be discriminatory to subject an individual or class of individuals on the basis of a disability ... to a denial of the opportunity of the individual or class to participate in or benefit from the goods, services, facilities, privileges, advantages, or ac-

---

1. Department of Health and Human Services guidelines addressing hospital reporting obligations under the Act if parents seek to withhold treatment from anencephalic infants are similarly inapplicable because of their silence regarding whether hospitals are allowed to terminate care in spite of a parent's wishes to the contrary. *See* 45 C.F.R. Part 84, App. C., paragraph (a)(5)(iii) (1992).

commodations of an entity." 42 U.S.C. § 12182(b)(1)(A)(i).

The Hospital asks this court for authorization to deny the benefits of ventilator services to Baby K by reason of her anencephaly. The Hospital's claim is that it is "futile" to keep alive an anencephalic baby, even though the mother has requested such treatment. But the plain language of the ADA does not permit the denial of ventilator services that would keep alive an anencephalic baby when those life-saving services would otherwise be provided to a baby without disabilities at the parent's request. The Hospital's reasoning would lead to the denial of medical services to anencephalic babies as a class of disabled individuals. Such discrimination against a vulnerable population class is exactly what the American with Disabilities Act was enacted to prohibit. The Hospital would therefore violate the ADA if it were to withhold ventilator treatment from Baby K.

### IV. Child Abuse Act

Plaintiff seeks a declaration that it may refuse to provide life-supporting medical care to Baby K without incurring liability under the Child Abuse Amendments of 1984, 42 U.S.C. § 5101 *et seq.* ("Child Abuse Act"). This request for relief must be denied because the Hospital has failed to join a necessary party—the Virginia Child Protective Services.

There is no private right of action against a health care provider under the Child Abuse Act. *Jensen v. Conrad,* 570 F.Supp. 91, 113 (D.S.C.1983) (citing *Perry v. Housing Authority of Charleston,* 664 F.2d 1210, 1213 (4th Cir.1981)), *aff'd,* 747 F.2d 185 (4th Cir.1984), *cert. denied,* 470 U.S. 1052, 105 S.Ct. 1754, 84 L.Ed.2d 818 (1985). The Act only authorizes states which receive federal grants for child abuse and neglect programs to bring legal action through their child protective services agencies to prevent the medical neglect of disabled infants. 42 U.S.C. § 5106a(b)(10)(C); 45 C.F.R. § 1340.-15(c)(2)(iii).

Because the Virginia Child Protective Services has an interest in a declaratory judgment regarding the Child Abuse Act and is the only party that can enforce the Act, it is a necessary party. This court must have the sole enforcing authority party before it before considering the declaratory judgment issue. *ARW Exploration Corp. v. Aguirre,* 947 F.2d 450, 454 (10th Cir.1991). Without the Virginia Child Protective Services as a party, no actual controversy exists as to this issue as required by the Declaratory Judgment Act. 28 U.S.C. § 2201. Thus, the Hospital's request for declaratory and injunctive relief under the Child Abuse Amendments must be denied. *See White v. National Union Fire Ins. Co.,* 913 F.2d 165, 167–168 (4th Cir.1990).

### V. Virginia Medical Malpractice Act

The Hospital seeks a declaration that its refusal to provide Baby K with ventilator treatment does not constitute malpractice under the Virginia Medical Malpractice Act, Va.Code § 8.01–581.1 *et seq.* Under the Declaratory Judgment Act, 28 U.S.C. § 2201, a federal court has discretion to assert jurisdiction to render a declaration. *Mitcheson v. Harris,* 955 F.2d 235 (4th Cir.1992); Wright & Miller, *Federal Practice and Procedure* § 2759 (1983). This discretion is related to the interest in having states decide questions of state law, an interest having jurisprudential roots in *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). *Mitcheson,* 955 F.2d at 237. In the Declaratory Judgment Act, Congress has afforded federal courts a freedom to consider the state interest in having state courts determine questions of state law. *Id.* at 238. Virginia courts have not addressed the question of the appropriate standard of care for anencephalic infants and whether an exception to the general standard of care applies to them. Besides the Malpractice Act's general rule, Virginia's legislature has also been silent on the issue. Moreover, the determination of the standard of care under Virginia's Medical Malpractice Act involves a review panel appointed by the Chief Justice of the Virginia Supreme Court. This review panel mechanism is "so intimately bound up with the rights and obligations being asserted as to require their application in federal courts under the doctrine of *Erie Railroad Co. v. Tompkins." DiAntonio v. Northampton–Accomack Memorial Hospital,* 628 F.2d 287,

290 (4th Cir.1980). Because of the significant state interests manifested by this review process as well as the Commonwealth's interest in resolving this contentious and unsettled social issue for itself, this court declines to "elbow its way" into Virginia medical malpractice standards. *Cf. Mitcheson,* 955 F.2d at 238 (quoting *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 122 n. 32, 104 S.Ct. 900, 920 n. 32, 79 L.Ed.2d 67 (1984)).

## VI. Constitutional and Common Law Issues

■■■ Baby K's parents disagree over whether or not to continue medical treatment for her. Mr. K and Baby K's guardian *ad litem* join the Hospital in seeking the right to override the wishes of Ms. H, Baby K's mother. Regardless of the questions of statutory interpretation presented in this case, Ms. H retains significant legal rights regarding her insistence that her daughter be kept alive with ventilator treatment. A parent has a constitutionally protected right to "bring up children" grounded in the Fourteenth Amendment's due process clause. *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923); *Pierce v. Society of Sisters,* 268 U.S. 510, 534–535, 45 S.Ct. 571, 573, 69 L.Ed. 1070 (1925). Parents have the "primary role" in the "nurture and upbringing of their children." *Wisconsin v. Yoder,* 406 U.S. 205, 232, 92 S.Ct. 1526, 1541, 32 L.Ed.2d 15 (1972); *Prince v. Massachusetts,* 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944). Decisions for children can be based in the parent's free exercise of religion, protected by the First Amendment. *Pierce,* 268 U.S. at 534–535, 45 S.Ct. at 573; *Yoder,* 406 U.S. at 234, 92 S.Ct. at 1542.

■■■ These constitutional principles extend to the right of parents to make medical treatment decisions for their minor children. Absent a finding of neglect·or abuse, parents retain plenary authority to seek medical care for their children, even when the decision might impinge on a liberty interest of the child. *Parham v. J.R.,* 442 U.S. 584, 603–604, 99 S.Ct. 2493, 2504, 61 L.Ed.2d 101 (1979) (commitment of child to mental health hospital). Indeed, there is a "presumption that the parents act in the best interests of their child" because the "natural bonds of affection lead parents to act in the best interests of their children." *Id.* at 602, 99 S.Ct. at 2504.

State law rights to make medical and surgical treatment decisions for a minor child are grounded in the common law and can also be inferred from state statutes. *See* Va.Code § 54.1–2969(B) (procedure governing consent to treatment of minors when parents are unavailable); Va.Code § 16.1–334(1) (right of emancipated minor to make her own medical care decisions without parental consent).

■■■ Based on Ms. H's "natural bonds of affection," *Parham,* 442 U.S. at 602, 99 S.Ct. at 2504, and the relative noninvolvement of Baby K's biological father, the constitutional and common law presumption must be that Ms. H. is the appropriate decision maker. "[W]hen parents do not agree on the issue of termination of life support ... this Court must yield to the presumption in favor of life." *In re Jane Doe, A Minor,* Civ. No. D–93064, mem. op. at 18 (Super.Ct. Fulton Co., Ga., October 17, 1991), *aff'd,* 262 Ga. 389, 418 S.E.2d 3 (1992). This presumption arises from the explicit guarantees of a right to life in the United States Constitution, Amendments V and XIV, and the Virginia Constitution, Article 1, Sections 1 and 11.

■■■ The presumption in favor of life in this case is also based on Ms. H's religious conviction that all life is sacred and must be protected, thus implicating her First Amendment rights. When an individual asserts "the Free Exercise Clause in conjunction with other constitutional protections, such as ... the right of parents," only a clear and compelling governmental interest can justify a statute that interferes with the person's religious convictions. *Employment Div., Department of Human Resources of Oregon v. Smith,* 494 U.S. 872, 881 n. 1, 110 S.Ct. 1595, 1601 n. 1, 108 L.Ed.2d 876 (1990); *Yoder,* 406 U.S. at 233, 92 S.Ct. at 1542.

■■■ The Hospital cannot establish any "clear and compelling" interest in this case. The Supreme Court has not decided whether the right to liberty encompasses a

right to refuse medical treatment, often called a "right to die." *Cruzan v. Director, Missouri Dept. of Health,* 497 U.S. 261, 277–279, 110 S.Ct. 2841, 2850–51, 111 L.Ed.2d 224 (refusing to decide this question). Parents have standing to assert the constitutional rights of their minor children. *Eisenstadt v. Baird,* 405 U.S. 438, 446 n. 6, 92 S.Ct. 1029, n. 6, 31 L.Ed.2d 349 (1972). When one parent asserts the child's explicit constitutional right to life as the basis for continuing medical treatment and the other is asserting the nebulous liberty interest in refusing life-saving treatment on behalf of a minor child, the explicit right to life must prevail. *See In re Jane Doe, supra.*

■ Reflecting the constitutional principles of family autonomy and the presumption in favor of life, courts have generally scrutinized a family's decision only where the family has sought to terminate or withhold medical treatment for an incompetent minor or incompetent adult. *See, e.g., Cruzan,* 497 U.S. at 270–75, 110 S.Ct. at 2847–49 (and cases cited therein). In a recent case in which a hospital sought to terminate life-supporting ventilation over the objections of the patient's husband, a Minnesota state court refused to remove decisionmaking authority from the husband. *In re Wanglie,* No. PX–91–283 (Prob.Ct., Hennepin Co., Minn., June 28, 1991). Likewise, where parents disagreed over whether to continue life-supporting mechanical ventilation, nutrition, and hydration for a minor child in an irreversible stupor or coma, a Georgia state court gave effect to the decision of the parent opting in favor of life support. *In re Jane Doe, supra.*[2]

At the very least, the Hospital must establish by clear and convincing evidence that Ms. H's treatment decision should not be respected because it would constitute abuse or neglect of Baby K. This clear and convincing evidence standard has been adopted by numerous courts and was upheld by the Supreme Court in *Cruzan* in authorizing the withdrawal of life-supporting treatment from an incompetent patient. *See Cruzan,* 497 U.S. at 284–85, 110 S.Ct. at 2854–55. In this case, where the choice essentially devolves to a subjective determination as to the quality of Baby's K's life, it cannot be said that the continuation of Baby K's life is so unreasonably harmful as to constitute child abuse or neglect.

For the foregoing reasons, the Hospital's request for a declaratory judgment that the withholding of ventilator treatment from Baby K would not violate the Emergency Medical Treatment and Active Labor Act, the Rehabilitation Act of 1973, the Americans with Disabilities Act, the Child Abuse Amendments of 1984, and the Virginia Medical Malpractice Act should be DENIED. Under the Emergency Medical Treatment and Active Labor Act, the Rehabilitation Act of 1973, and the Americans with Disabilities Act, the Hospital is legally obligated to provide ventilator treatment to Baby K. The court makes no ruling as to any rights or obligations under the Child Abuse Amendments of 1984 and under the Virginia Medical Malpractice Act.

An appropriate order shall issue.

---

**2.** Although the court in *Jane Doe* had appointed a guardian *ad litem* because of the parents' disagreement, the guardian's view (if any) was not discussed in the court's ruling. This is consistent with the limited role of a guardian *ad litem* as an independent fact finder and not a surrogate decisionmaker where family members are involved. Under Virginia law, the role of a guardian *ad litem* appointed under Va.Code § 8.01–9(A) is to "investigate thoroughly the facts" and "carefully examine[ ] the facts surrounding the case." *Ruffin v. Commonwealth,* 10 Va.App. 488, 393 S.E.2d 425 (Va.App.1990). The recommendation of Baby K's court-appointed guardian *ad litem* is thus irrelevant to the disposition of this case.