### In the Matter of BABY "K" (Three Cases).

### Nos. 93–1899, 93–1923 and 93–1924.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 26, 1993.

Decided Feb. 10, 1994.

**ARGUED:** Julia Krebs–Markrich, John E. Coffey, Hazel & Thomas, P.C., Falls Church, Virginia; Pleasant S. Brodnax, III, Alexandria, Virginia, for Appellants. Ellen Joanne Flannery, Covington & Burling, Washington, D.C., for Appellee. **ON BRIEF:** Jennifer L.W. Korjus, Hazel & Thomas, P.C., Falls Church, Virginia; Kenneth E. Labowitz, Young, Goldman & Van Beek, Alexandria, Virginia, for Appellants. Debra Ann Palmer, Richard W. Buchanan, Theodore M. Hirsch, Georgia Kazakis, Covington & Burling, Washington, D.C., for Appellee. Alison Paige Landry, ReNee D. Brooks, Department for Rights of Virginians with Disabilities, Richmond, Virginia, for Amicus Curiae Department for Rights of Virginians with Disabilities; Walter A. Smith, Jr., Stephan E. Lawton, Anne M. Dellinger, Laura E. Loeb, Hogan & Hartson, Washington, D.C., for Amici Curiae American Academy of Pediatrics and Society of Critical Care Medicine.

Before WILKINS and WILLIAMS, Circuit Judges, and SPROUSE, Senior Circuit Judge.

## OPINION

WILKINS, Circuit Judge:

■ The Hospital[1] instituted this action against Ms. H, Mr. K, and Baby K, seeking a declaratory judgment that it is not required under the Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C.A. § 1395dd (West 1992),[2] to provide treatment other than warmth, nutrition, and hydration to Baby K, an anencephalic infant. Because we agree with the district court, 832 F.Supp. 1022, that EMTALA gives rise to a duty on the part of the Hospital to provide respiratory support to Baby K when she is presented at the Hospital in respiratory distress and treatment is requested for her, we affirm.

## I.

Baby K was born at the Hospital in October of 1992 with anencephaly, a congenital malformation in which a major portion of the brain, skull, and scalp are missing. While the presence of a brain stem does support her autonomic functions and reflex actions, because Baby K lacks a cerebrum, she is permanently unconscious. Thus, she has no cognitive abilities or awareness. She cannot see, hear, or otherwise interact with her environment.

When Baby K had difficulty breathing on her own at birth, Hospital physicians placed her on a mechanical ventilator. This respiratory support allowed the doctors to confirm the diagnosis and gave Ms. H, the mother, an opportunity to fully understand the diagnosis and prognosis of Baby K's condition. The physicians explained to Ms. H that most anencephalic infants die within a few days of birth due to breathing difficulties and other complications. Because aggressive treatment would serve no therapeutic or palliative purpose, they recommended that Baby K only be provided with supportive care in the form of nutrition, hydration, and warmth. Physicians at the Hospital also discussed with Ms. H the possibility of a "Do Not Resuscitate Order" that would provide for

---

1. Due to the parties' request for anonymity, all identifying information has been omitted from this opinion and anonyms are used to refer to the parties.

2. The Hospital also sought declaratory relief under § 504 of the Rehabilitation Act of 1973 (Rehabilitation Act), 29 U.S.C.A. § 794 (West Supp. 1993); the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C.A. §§ 12101 *et seq.* (West 1993); the Child Abuse Prevention and Treatment Act (Child Abuse Act), 42 U.S.C.A. §§ 5101–5106h (West Supp.1993); and the stat-

utes and common law of Virginia. In addressing these provisions, the district court concluded that a failure to provide respiratory support to Baby K because of her condition of anencephaly would constitute discrimination in violation of the ADA and the Rehabilitation Act but declined to rule on the application of the Child Abuse Act or Virginia law. Because we conclude that the Hospital has a duty to render stabilizing treatment under EMTALA, we need not address its obligations under the remaining federal statutes or the laws of Virginia.

the withholding of lifesaving measures in the future.

The treating physicians and Ms. H failed to reach an agreement as to the appropriate care. Ms. H insisted that Baby K be provided with mechanical breathing assistance whenever the infant developed difficulty breathing on her own, while the physicians maintained that such care was inappropriate. As a result of this impasse, the Hospital sought to transfer Baby K to another hospital. This attempt failed when all of the hospitals in the area with pediatric intensive care units declined to accept the infant. In November of 1992, when Baby K no longer needed the services of an acute-care hospital, she was transferred to a nearby nursing home.

Since being transferred to the nursing home, Baby K has been readmitted to the Hospital three times due to breathing difficulties. Each time she has been provided with breathing assistance and, after stabilization, has been discharged to the nursing home. Following Baby K's second admission, the Hospital filed this action to resolve the issue of whether it is obligated to provide emergency medical treatment to Baby K that it deems medically and ethically inappropriate. Baby K's guardian *ad litem* and her father, Mr. K, joined in the Hospital's request for a declaration that the Hospital is not required to provide respiratory support or other aggressive treatments. Ms. H contested the Hospital's request for declaratory relief. After the district court issued its findings of fact and conclusions of law denying the requested relief, the Hospital, Mr. K, and Baby K's guardian *ad litem* (collectively referred to as the "Hospital") noticed this appeal.

## II.

■ Congress enacted EMTALA in response to its "concern that hospitals were 'dumping' patients [who were] unable to pay, by either refusing to provide emergency medical treatment or transferring patients before their emergency conditions were stabilized." *Brooks v. Maryland Gen. Hosp. Inc.*, 996 F.2d 708, 710 (4th Cir.1993). Through EMTALA, Congress sought "to provide an 'adequate first response to a medical crisis' for all patients," *Baber v. Hospital Corp. of America*, 977 F.2d 872, 880 (4th Cir.1992) (quoting 131 Cong.Rec. S13904 (daily ed. Oct. 23, 1985) (statement of Sen. Dole)); *see also Brooker v. Desert Hosp. Corp.*, 947 F.2d 412, 415 (9th Cir.1991) (holding that EMTALA applies "to any and all patients"); *Gatewood v. Washington Healthcare Corp.*, 933 F.2d 1037, 1040 (D.C.Cir. 1991) (same); *Cleland v. Bronson Health Care Group, Inc.*, 917 F.2d 266, 268 (6th Cir.1990) (same), by imposing two duties on hospitals that have entered into Medicare provider agreements.

■ First, those hospitals with an emergency medical department must provide an appropriate medical screening to determine whether an emergency medical condition exists for any individual who comes to the emergency medical department requesting treatment. 42 U.S.C.A. § 1395dd(a).[3] A hospital fulfills this duty if it utilizes identical screening procedures for all patients complaining of the same condition or exhibiting the same symptoms. *See Baber*, 977 F.2d at 879 n. 6.

■ An additional duty arises if an emergency medical condition is discovered during the screening process. *See* 42 U.S.C.A. § 1395dd(b). EMTALA defines an "emergency medical condition" as including:

a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—

---

**3.** The full text of subsection (a) provides:

In the case of a hospital that has a hospital emergency department, if any individual (whether or not eligible for benefits under this subchapter) comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition (within the meaning of subsection (e)(1) of this section) exists.

42 U.S.C.A. § 1395dd(a).

(i) placing the health of the individual ... in serious jeopardy,

(ii) serious impairment to bodily functions, or

(iii) serious dysfunction of any bodily organ or part.

42 U.S.C.A. § 1395dd(e)(1)(A).[4] When an individual is diagnosed as presenting an emergency medical condition:

the hospital must provide either—

(A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or

(B) for the transfer of the individual to another medical facility in accordance with subsection (c) of this section.

42 U.S.C.A. § 1395dd(b)(1). The treatment required "to stabilize" an individual is that treatment "necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility." 42 U.S.C.A. § 1395dd(e)(3)(A). Therefore, once an individual has been diagnosed as presenting an emergency medical condition, the hospital must provide that treatment necessary to prevent the material deterioration of the individual's condition or provide for an appropriate transfer to another facility.

In the application of these provisions to Baby K, the Hospital concedes that when Baby K is presented in respiratory distress a failure to provide "immediate medical attention" would reasonably be expected to cause serious impairment of her bodily functions. See 42 U.S.C.A. § 1395dd(e)(1)(A). Thus, her breathing difficulty qualifies as an emergency medical condition, and the diagnosis of this emergency medical condition triggers the duty of the hospital to provide Baby K with stabilizing treatment or to transfer her in accordance with the provisions of EMTALA. Since transfer is not an option available to the Hospital at this juncture,[5] the Hospital must stabilize Baby K's condition.

The Hospital acknowledged in its complaint that aggressive treatment, including mechanical ventilation, is necessary to "assure within a reasonable medical probability, that no material deterioration of Baby K's condition is likely to occur." Thus, stabilization of her condition requires the Hospital to provide respiratory support through the use of a respirator or other means necessary to ensure adequate ventilation. In sum, a straightforward application of the statute obligates the Hospital to provide respiratory support to Baby K when she arrives at the emergency department[6] of the Hospital in

---

**4.** A pregnant woman who is having contractions also qualifies as being in an "emergency medical condition" if:

(i) ... there is inadequate time to effect a safe transfer to another hospital before delivery, or

(ii) ... transfer may pose a threat to the health or safety of the woman or unborn child.

42 U.S.C.A. § 1395dd(e)(1)(B). This portion of the statute is not applicable to the appeal before us.

**5.** In order for a hospital to transfer a patient prior to stabilization, EMTALA requires: (1) the patient or a person acting on the patient's behalf to request a transfer in writing after being informed of the risks involved and the obligations of the hospital under EMTALA; or (2) a proper certification that the medical benefits expected from the transfer outweigh the risks involved. 42 U.S.C.A. § 1395dd(c)(1). In addition, the transfer must meet the criteria for an appropriate transfer which include the requirement that a qualified receiving facility agree to accept the patient and to provide appropriate medical treatment. 42 U.S.C.A. § 1395dd(c)(1)(B), (c)(2). Since Ms. H objects to the transfer of Baby K, since the Hospital has not obtained a certification that the benefits of a transfer would outweigh the medical risks involved, and since no qualified medical facility has agreed to accept Baby K, the requirements for transfer prior to stabilization have not been met. If Ms. H requests a transfer or the Hospital obtains a certification that the benefits of a transfer would outweigh the risks involved, and all of the requirements for an appropriate transfer are met, then the Hospital could, of course, transfer Baby K to another qualified medical facility prior to stabilization.

**6.** It is not clear from the record whether the movement of Baby K from the nursing home to the Hospital constitutes a discharge from the nursing home and presentation at the emergency department of the Hospital or a transfer to the Hospital. Subsection (g) of EMTALA provides that participating hospitals that have "specialized capabilities or facilities (such as ... neonatal intensive care units ...) *shall not refuse* to accept an appropriate transfer of an individual who requires such specialized capabilities or fa-

respiratory distress and treatment is requested on her behalf.[7]

### III.

In an effort to avoid the result that follows from the plain language of EMTALA, the Hospital offers four arguments. The Hospital claims: (1) that this court has previously interpreted EMTALA as only requiring uniform treatment of all patients exhibiting the same condition; (2) that in prohibiting disparate emergency medical treatment Congress did not intend to require physicians to provide treatment outside the prevailing standard of medical care; (3) that an interpretation of EMTALA that requires a hospital or physician to provide respiratory support to an anencephalic infant fails to recognize a physician's ability, under Virginia law, to refuse to provide medical treatment that the physician considers medically or ethically inappropriate; and (4) that EMTALA only applies to patients who are transferred from a hospital in an unstable condition. We find these arguments unavailing.[8]

### A.

Relying on the decisions of this court in *Baber v. Hospital Corp. of America*, 977 F.2d 872 (4th Cir.1992), and *Brooks v. Maryland Gen. Hosp. Inc.*, 996 F.2d 708 (4th Cir.1993), the Hospital contends that it is only required to provide Baby K with the same treatment that it would provide other anencephalic infants—supportive care in the form of warmth, nutrition, and hydration. The Hospital quotes language from *Baber* and *Brooks* as supporting the proposition that EMTALA only requires participating hospitals to provide uniform treatment to all patients exhibiting the same emergency medical condition.

Advancing the proposition that anencephaly, as opposed to respiratory distress, is the emergency medical condition at issue, the Hospital concludes that it is only required to provide uniform treatment to all anencephalic infants. We disagree.

In *Baber* and *Brooks*, this court addressed the "appropriate medical screening" requirement of EMTALA. In the absence of a statutory definition for this term, we concluded that it should be defined as requiring participating hospitals to apply uniform screening procedures to all individuals coming to the emergency room of the hospital requesting treatment. *Baber*, 977 F.2d at 880; *Brooks*, 996 F.2d at 710–11. These cases dealt with screening procedures; neither addressed a hospital's duty to provide stabilizing treatment for an emergency medical condition.

With this issue now before us, we conclude that the duty of the Hospital to provide stabilizing treatment for an emergency medical condition is not coextensive with the duty of the Hospital to provide an "appropriate medical screening." Congress has statutorily defined the duty of a hospital to provide stabilizing treatment as requiring that treatment necessary to prevent the material deterioration of a patient's condition. 42 U.S.C.A. § 1395dd(e)(3)(A). If, as the Hospital suggests, it were only required to provide uniform treatment, it could provide any level of treatment to Baby K, including a level of treatment that would allow her condition to materially deteriorate, so long as the care she was provided was consistent with the care provided to other individuals. *See Baber*, 977 F.2d at 879 n. 7 ("[H]ospitals could theoretically avoid liability by providing very cursory and substandard screenings to

---

cilities if the hospital has the capacity to treat the individual." 42 U.S.C.A. § 1395dd(g) (emphasis added). When she experiences respiratory distress, Baby K requires specialized facilities and capabilities that the nursing home does not possess. The Hospital admittedly does possess these facilities and capabilities, including mechanical ventilators and a pediatric intensive care unit. Thus, irrespective of whether the movement of Baby K between the two facilities constitutes a discharge and presentment or a transfer, acceptance and treatment by the Hospital is required.

7. The provisions of EMTALA would not, of course, be limited to the condition of respiratory distress or the provision of respiratory support. Any diagnosed "emergency medical condition" experienced by Baby K would require stabilizing treatment unless an appropriate transfer could be effected.

8. Because the issues presented raise questions of statutory interpretation, we conduct a de novo review. *Baber*, 977 F.2d at 876.

all patients . . . ."). The definition of stabilizing treatment advocated by the Hospital directly conflicts with the plain language of EMTALA.

As we have previously stated, "it is not our role to rewrite legislation passed by Congress. When a statute is clear and unambiguous, we must apply its terms as written." *Baber*, 977 F.2d at 878. The terms of EMTALA as written do not allow the Hospital to fulfill its duty to provide stabilizing treatment by simply dispensing uniform treatment. Rather, the Hospital must provide that treatment necessary to prevent the material deterioration of each patient's emergency medical condition. In the case of Baby K, the treatment necessary to prevent the material deterioration of her condition when she is in respiratory distress includes respiratory support.

Even if this court were to interpret EMTALA as requiring hospitals to provide uniform treatment for emergency medical conditions, we could not find that the Hospital is only required to provide Baby K with warmth, nutrition, and hydration. As the Hospital acknowledged during oral argument, Baby K resides at the nursing home for months at a time without requiring emergency medical attention. Only when she has experienced episodes of bradypnea or apnea[9] has Baby K required respiratory support to prevent serious impairment of her bodily functions. It is bradypnea or apnea, not anencephaly, that is the emergency medical condition that brings Baby K to the Hospital for treatment. Uniform treatment of emergency medical conditions would require the Hospital to provide Baby K with the same treatment that the Hospital provides all other patients experiencing bradypnea or apnea. The Hospital does not allege that it would refuse to provide respiratory support to infants experiencing bradypnea or apnea who do not have anencephaly. Indeed, a refusal to provide such treatment would likely be considered as providing *no* emergency medical treatment. *See Baber*, 977 F.2d at 879 n. 7 (stating that the provision of cursory medical screenings might be considered a failure to screen).

## B.

The second argument of the Hospital is that, in redressing the problem of disparate emergency medical treatment, Congress did not intend to require physicians to provide medical treatment outside the prevailing standard of medical care. The Hospital asserts that, because of their extremely limited life expectancy and because any treatment of their condition is futile, the prevailing standard of medical care for infants with anencephaly is to provide only warmth, nutrition, and hydration. Thus, it maintains that a requirement to provide respiratory assistance would exceed the prevailing standard of medical care. However, the plain language of EMTALA requires stabilizing treatment for any individual who comes to a participating hospital, is diagnosed as having an emergency medical condition, and cannot be transferred. 42 U.S.C.A. § 1395dd(b). "[I]n the absence of 'a clearly expressed legislative intent to the contrary,'" unambiguous statutory language is ordinarily conclusive. *United States v. Blackwell*, 946 F.2d 1049, 1052 (4th Cir.1991) (quoting *Russello v. United States*, 464 U.S. 16, 20, 104 S.Ct. 296, 299, 78 L.Ed.2d 17 (1983)). The Hospital has been unable to identify, nor has our research revealed, any statutory language or legislative history evincing a Congressional intent to create an exception to the duty to provide stabilizing treatment when the required treatment would exceed the prevailing standard of medical care. We recognize the dilemma facing physicians who are requested to provide treatment they consider morally and ethically inappropriate, but we cannot ignore the plain language of the statute because "to do so would 'transcend our judicial function.'" *Baber*, 977 F.2d at 884 (quoting *Iselin v. United States*, 270 U.S. 245, 250–51, 46 S.Ct. 248, 250, 70 L.Ed. 566 (1926). The appropriate branch to redress the policy concerns of the Hospital is Congress.

---

9. Bradypnea is an "abnormal slowness of breathing." Dorland's Illustrated Medical Dictionary 230 (27th ed. 1988). In an infant who has established and sustained spontaneous breathing, apnea describes the cessation of respiration for more than 60 seconds. *Id.* at 112.

## C.

■ The Hospital further argues that EMTALA cannot be construed to require it to provide respiratory support to anencephalics when its physicians deem such care inappropriate, because Virginia law permits physicians to refuse to provide such care. Section 54.1–2990 of the Health Care Decisions Act (HCDA) of Virginia provides that "[n]othing in this article shall be construed to require a physician to prescribe or render medical treatment to a patient that the physician determines to be medically or ethically inappropriate." Va.Code Ann. § 54.1–2990 (Michie Supp.1993). The Hospital maintains that EMTALA only obligates a hospital to provide stabilizing treatment "within the staff and facilities available at the hospital," 42 U.S.C.A. § 1395dd(b)(1)(A). It reasons that because its physicians object to providing respiratory support to anencephalics, it has no physicians available to provide respiratory treatment for Baby K and, therefore, is not required by EMTALA to provide such treatment. We disagree.

The duty to provide stabilizing treatment set forth in EMTALA applies not only to participating hospitals but also to treating physicians in participating hospitals. 42 U.S.C.A. § 1395dd(d)(1)(B). EMTALA does not provide an exception for stabilizing treatment physicians may deem medically or ethically inappropriate. Consequently, to the extent § 54.1–2990 exempts physicians from providing care they consider medically or ethically inappropriate, it directly conflicts with the provisions of EMTALA that require stabilizing treatment to be provided.

It is well settled that state action must give way to federal legislation where a valid "act of Congress, fairly interpreted, is in actual conflict with the law of the state," *Savage v. Jones,* 225 U.S. 501, 533, 32 S.Ct. 715, 726, 56 L.Ed. 1182 (1912), and EMTALA provides that state and local laws that directly conflict with the requirements of EMTALA are preempted. 42 U.S.C.A. § 1395dd(f).

The Hospital does not allege that EMTALA is an invalid act of Congress. Therefore, to the extent that § 54.1–2990 applies to medical treatment decisions on behalf of infants [10] and to the extent that § 54.1–2990 exempts treating physicians in participating hospitals from providing care they consider medically or ethically inappropriate, it is preempted—it does not allow the physicians treating Baby K to refuse to provide her with respiratory support.

## D.

■ The final contention advanced by the Hospital is that EMTALA only applies to patients who are transferred from a hospital in an unstable condition. The Hospital grounds this argument on the definition of stabilizing treatment as that treatment "necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the *transfer* of the individual from a facility." 42 U.S.C.A. § 1395dd(e)(3)(A) (emphasis added). According to the Hospital, the use of the word "transfer" limits the duty of hospitals and physicians to provide stabilizing treatment to situations in which the patient is to be subsequently transferred to another facility. The end result of this reasoning would allow hospitals and physicians to avoid providing stabilizing treatment by simply refusing to transfer the patient or, as in the case of Baby K, elect not to provide stabilizing treatment because other hospitals will not accept a transfer.

As previously stated, § 1395dd(b) requires a hospital to provide stabilizing treatment to any individual who comes to a participating hospital, is diagnosed as presenting an emergency medical condition, and cannot be transferred in accordance with the provisions of subsection (c). The use of the word "transfer" to describe the duty of a hospital to provide stabilizing treatment evinces a Congressional intent to require stabilization prior

---

**10.** By its terms the application of § 54.1–2990 is limited to the HCDA, Va.Code Ann. §§ 54.1–2981 to 54.1–2993 (Michie Supp.1993). The HCDA governs advance medical directives by adults and surrogate medical treatment decisions on behalf of adults. No part of the HCDA sets forth provisions for dealing with medical treatment decisions on behalf of infants. Therefore, the Virginia legislature presumably did not intend § 54.1–2990 to apply to medical treatment decisions on behalf of infants.

to discharge or that treatment necessary to prevent material deterioration of the patient's condition during transfer. It was not intended to allow hospitals and physicians to avoid liability under EMTALA by accepting and screening a patient and then refusing to treat the patient because the patient cannot or will not be transferred. *See, e.g., Thornton v. Southwest Detroit Hosp.*, 895 F.2d 1131, 1134 (6th Cir.1990) ("Once a patient is found to suffer from an emergency medical condition, the hospital must give the patient treatment to stabilize that condition unless the patient can be transferred without danger of the patient's condition deteriorating."); *Burditt v. U.S. Dept. of Health & Human Services*, 934 F.2d 1362, 1368 (5th Cir.1991) ("Patients diagnosed with an 'emergency medical condition' . . . must either be treated or be transferred . . . ."). The argument of the Hospital to the contrary is without merit.

## IV.

It is beyond the limits of our judicial function to address the moral or ethical propriety of providing emergency stabilizing medical treatment to anencephalic infants. We are bound to interpret federal statutes in accordance with their plain language and any expressed congressional intent. Congress rejected a case-by-case approach to determining what emergency medical treatment hospitals and physicians must provide and to whom they must provide it; instead, it required hospitals and physicians to provide stabilizing care to any individual presenting an emergency medical condition. EMTALA does not carve out an exception for anencephalic infants in respiratory distress any more than it carves out an exception for comatose patients, those with lung cancer, or those with muscular dystrophy—all of whom may repeatedly seek emergency stabilizing treatment for respiratory distress and also possess an underlying medical condition that severely affects their quality of life and ultimately may result in their death. Because EMTALA does not provide for such an exception, the judgment of the district court is affirmed.

*AFFIRMED.*

SPROUSE, Senior Circuit Judge, dissenting:

I respectfully dissent.

I have no quarrel with the majority's conclusion that the duty imposed on hospitals by EMTALA to provide stabilizing treatment for an emergency condition is different from its duty to provide "appropriate medical screening." There is no question that once a medical condition is characterized as an "emergency medical condition" contemplated by EMTALA, the patient must be stabilized to prevent material deterioration of the condition. 42 U.S.C.A. §§ 1395dd(b)(1)(A), (e)(3)(A) (Supp.1991).

I simply do not believe, however, that Congress, in enacting EMTALA, meant for the judiciary to superintend the sensitive decision-making process between family and physicians at the bedside of a helpless and terminally ill patient under the circumstances of this case. Tragic end-of-life hospital dramas such as this one do not represent phenomena susceptible of uniform legal control. In my view, Congress, even in its weakest moments, would not have attempted to impose federal control in this sensitive, private area. Rather, the statute was designed narrowly to correct a specific abuse: hospital "dumping" of indigent or uninsured emergency patients. *Brooks v. Maryland Gen. Hosp., Inc.*, 996 F.2d 708, 710 (4th Cir.1993); *Baber v. Hospital Corp. of America*, 977 F.2d 872, 880 (4th Cir.1992). There is no indication in the legislative history of EMTALA that Congress meant to extend the statute's reach to hospital-patient relationships that do not involve "dumping." Clearly, there is no suggestion of patient "dumping" in this case. To the contrary, Baby K's introduction to the hospital was not for emergency treatment—she was born there. She was twice readmitted and after her subsidiary medical condition was stabilized, transferred back to a nursing home. In light of the purposes of the statute and this child's unique circumstances, I would find this case to be outside the scope of EMTALA's anti-dumping provisions.

I also submit that EMTALA's language concerning the type and extent of emergency treatment to be extended to all patients was

not intended to cover the continued emergencies that typically attend patients like Baby K. The law was crafted to effect the purpose of preventing disparate treatment between emergency patients. *See* H.R.Rep. No. 241, 99th Cong., 2d Sess., pt. 1 at 27 (1986), *reprinted in* 1986 U.S.C.A.A.N. 42, 579, 605. In my view, Baby K is not that kind of emergency patient contemplated by the statute, although by the very nature of her terminal illness, she will suffer repeated medical emergencies during her day-to-day maintenance care. The hospital argues that anencephaly, not the subsidiary respiratory failure, is the condition that should be reviewed in order to judge the applicability *vel non* of EMTALA. I agree. I would consider anencephaly as the relevant condition and the respiratory difficulty as one of many subsidiary conditions found in a patient with the disease. EMTALA was not designed to reach such circumstances.

The tragic phenomenon Baby K represents exemplifies the need to take a case-by-case approach to determine if an emergency episode is governed by EMTALA. Baby K's condition presents her parents and doctors with decision-making choices that are different even from the difficult choices presented by other terminal diseases. Specifically, as an anencephalic infant, Baby K is permanently unconscious. She cannot hear, cannot see, and has no cognitive abilities. She has no awareness of and cannot interact with her environment in any way. Since there is no medical treatment that can improve her condition, she will be in this state for as long as she lives. Given this unique medical condition, whatever treatment appropriate for her unspeakably tragic illness should be regarded as a continuum, not as a series of discrete emergency medical conditions to be considered in isolation. Humanitarian concerns dictate appropriate care. However, if resort must be had to our courts to test the appropriateness of the care, the legal vehicle should be state malpractice law.

In my view, considering the discrete factual circumstances of Baby K's condition and previous treatment, if she is transferred again from the nursing home to the hospital in respiratory distress, that condition should be considered integral to the anencephalic condition, and I would hold that there has been no violation of EMTALA. I emphasize that this view contemplates a case-by-case determination. Individual cases involving victims of trauma, cancer, heart attack, or other catastrophic illness, who are denied potentially life-saving treatments, may well require different analyses.