**Charles M. GARDNER, et al., Plaintiffs,**

v.

**ELMORE COMMUNITY HOSP., Defendant.**

**No. CIV.A.96–D–1566–N.**

United States District Court, M.D. Alabama, Northern Division.

Sept. 13, 1999.

Stephen McKay Nesmith, Frank W. Riggs, III, Montgomery, AL, for Plaintiffs.

James E. Williams, Montgomery, AL, for Defendant.

### MEMORANDUM OPINION AND ORDER

DE MENT, District Judge.

Before the court is Defendant Elmore Community Hospital's ("Hospital") Motion For Summary Judgment ("Mot."), along with its Memorandum ("Def.'s Mem."), filed June 13, 1999. Plaintiffs filed a Response To Defendant's Motion For Summary Judgment ("Pls.' Resp."), along with a Brief In Opposition To Summary Judgment ("Pls.' Br."), on June 21, 1999. After careful consideration of the arguments of counsel, the relevant law, and the record as a whole, the court finds that Defendant Hospital's Motion For Summary Judgment is due to be granted.

### JURISDICTION AND VENUE

The court properly exercises subject matter jurisdiction over this action, pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1395dd, et seq. The Parties do not contest personal jurisdiction or venue.

### SUMMARY JUDGMENT STANDARD

On a motion for summary judgment, the court is to construe the evidence and factual inferences arising therefrom in the light

most favorable to the nonmoving party. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Summary judgment can be entered on a claim only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). As the Supreme Court has explained the summary judgment standard:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no "genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (citing Fed.R.Civ.P. 56(c)).

The trial court's function at this juncture is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citations omitted). A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *see also Barfield v. Brierton*, 883 F.2d 923, 933 (11th Cir.1989).

The party seeking summary judgment has the initial burden of informing the court of the basis for the motion and of establishing, based on relevant "portions of 'the pleadings, depositions, answers to in-

terrogatories, and admissions on file, together with the affidavits, if any,'" that "there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548 (citing Fed. R.Civ.P. 56(c)). The mechanics of satisfying the initial burden vary, however, depending upon which party, the movant or the nonmovant, bears the burden of proof at trial. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir.1993) (detailing the nature of the parties' responsibilities when preparing or defending against a motion for summary judgment).

Once this initial demonstration under Rule 56(c) is made, the burden of production, not persuasion, shifts to the nonmoving party. The nonmoving party must "go beyond the pleadings and by [his or] her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548 (citing Fed.R.Civ.P. 56(e)). In meeting this burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). That party must demonstrate that there is a "genuine issue for trial." Fed.R.Civ.P. 56(e); *see also Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348; *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. An action is void of a material issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY [1]

Plaintiffs Charles M. Gardner ("Gardner") and Jimmie Newman ("Newman")

---

**1.** Although the facts must be construed in the light most favorable to the non-moving party, some of the facts below are contradictory. The court includes these facts because Plaintiff Newman's vague recollection contradicts some of the record; specifically, Plaintiffs' medical records from Defendant Hospital. The court notes, however, that both Parties submitted these medical records in support of their arguments.

sustained serious injuries in a car accident on the evening of October 16, 1994. Following the accident, an ambulance took Plaintiffs to Defendant Hospital. (Am. Comp.¶ 10.) Plaintiffs arrived at Defendant Hospital shortly before midnight with medical emergencies. (Compl. ¶ 6; Answer ¶ 4.) Defendant Hospital admitted both Plaintiffs (Def.'s Ex. D.), despite the facts that Plaintiff Newman had no health insurance and that Plaintiff Gardner was only partially covered by Medicare.[2]

Defendant Hospital was informed that Plaintiffs were involved in a motor vehicle accident and had possibly suffered both head trauma and loss of consciousness. (Pls.' Br. at 4.) Both Plaintiffs were presented in spinal packages. (Def.'s Ex. D.) Plaintiff Newman's memory of the events while in the care of Defendant Hospital is somewhat limited.[3] (Newman Dep. at 50) At some point after Plaintiffs' arrival, an employee of Defendant Hospital obtained both Plaintiffs' medical histories and vital signs. (*Id.* at 45.) Throughout the night, Defendant Hospital took Plaintiff Newman's vital signs—including blood pressure, pulse, and temperature—at least four times and Plaintiff Gardner's at least six times. (Def.'s Ex. D.) Additionally, Defendant Hospital gave Plaintiff Gardner an EKG. (*Id.*)

While the nurse attended to him, Plaintiff Newman complained of a headache and neck pain. (Patterson Aff. at 2.) Also, Plaintiff Newman had lacerations near his right eye. (Def.'s Ex. D.) Despite these injuries, Plaintiff Newman testified that he does not remember the physician asking him questions. (Newman Dep. at 48–49.) Plaintiff Newman's sole recollection of be-

ing treated by a physician is that the physician sent him to have x-rays taken. (*Id.* at 48.) However, according to the medical records, Defendant Hospital cleaned and sutured the laceration around Plaintiff Newman's eye. (Def.'s Ex. D.)

Plaintiff Gardner also complained of pain all over his body and had a laceration around his lower lip. (Patterson Aff. at 2.) Although JoAnn Newman testified that she noticed no stitches on Plaintiff Gardner upon his arrival home from Defendant Hospital (JoAnn Newman Dep. at 40), Plaintiff Gardner received sutures on his lip laceration. (Def.'s Ex. D.)

Plaintiffs further assert that they were not accommodated by Defendant Hospital and that they were treated rudely. (Newman Dep. at 28.) Specifically, Plaintiff Newman testified in his deposition that there was a "nurse [and] some older doctor..., and they were both real belligerent.... No matter what you asked them, they wouldn't accommodate you for nothing." (*Id.*) Plaintiff Newman also testified that, although he requested some Tylenol to relieve his pain, the nurse refused to give him any. (*Id.* at 41.) In fact, Plaintiff Newman testified that the nurse told him "to lay there and shut up." (*Id.*) According to Plaintiffs' medical records, however, Defendant Hospital gave Plaintiffs a Tylenol elixir for pain relief at 6:30 a.m.

Both Plaintiffs eventually had x-rays taken.[4] (Def.'s Ex. D.) Plaintiff Newman's medical records indicate that Defendant Hospital took x-rays of his chest, elbow, spine, and facial bones. (*Id.*) Plaintiff Gardner's medical records indicate that

---

**2.** Whether Defendant Hospital knew of Plaintiffs' ability to pay for medical care is unclear from the record. The court notes, however, that this is not a material fact. *See Summers v. Baptist Med. Ctr. Arkadelphia,* 91 F.3d 1132 (8th Cir.1996) (en banc) (holding that evidence of a purpose to "dump" a patient is not required to support a claim under § 1395dd).

**3.** On May 25, 1997 Plaintiff Gardner died of causes unrelated to this action. He is, thus, unavailable as a witness in this action. On

January 26, 1999 this court granted a Motion For Substitution, thereby naming Betty JoAnn Newman, the mother of Plaintiff Newman, sister of deceased Plaintiff Gardner, and administratrix of Plaintiff Gardner's estate, as a party Plaintiff in this cause.

**4.** It is unclear from the record at what time Plaintiffs had x-rays taken. The court notes, however, that the precise time is immaterial to the claims presented.

Defendant Hospital took x-rays of his chest, left arm, facial bones, and spine. (*Id.*) Defendant Hospital concluded from the x-rays that Plaintiffs had no broken bones.[5] (*Id.*)

Approximately eight hours after Plaintiffs were admitted, Defendant Hospital diagnosed and released them both. (*Id.*) Defendant Hospital diagnosed Plaintiff Gardner as having multiple soft tissue trauma and a laceration of his lower lip. (*Id.*) Defendant Hospital determined that Plaintiff Newman also had multiple soft tissue trauma. (*Id.*) According to JoAnn Newman, Defendant Hospital released Plaintiffs despite the facts that Plaintiff Gardner was bleeding and was not ambulatory. (JoAnn Newman Dep. at 41.) Plaintiffs' medical records, however, indicate that Plaintiffs left the hospital in ambulatory and stable conditions. (Def.'s Ex. D.) In addition, Plaintiff Newman confirms this by his testimony that Plaintiffs walked out of Defendant Hospital on their own. (Newman Dep. at 71.)

Plaintiff Newman's daughter and son picked up Plaintiffs at the hospital. (Newman Dep. at 68.) Plaintiff Gardner's head was swollen and he was bleeding severely when he arrived home. (JoAnn Newman Dep. at 29–30.) Plaintiff Newman had two black eyes and a swollen nose. (*Id.*) Within an hour of Plaintiffs' arrival at home, JoAnn Newman took both Plaintiffs to Baptist Medical Center ("Baptist"). (*Id.* at 35.)

At Baptist, both Plaintiffs received screening examinations. (Pls.' Baptist Med. R.) Baptist took their medical history, vital signs, and also took x-rays. (*Id.*) Baptist diagnosed Plaintiff Newman with "facial fractures" and diagnosed Plaintiff

Gardner with "fractured facial bones and broken ribs." (Pl.'s. Br. at 2.)

Plaintiffs commenced this action on October 17, 1996. In their original Complaint, Plaintiffs alleged that Defendant Hospital was liable for actions taken when Plaintiffs sought medical treatment at Defendant Hospital's emergency room on the night of October 16, 1994. Plaintiffs base their claims on the Emergency Medical Treatment and Active Labor Act ("EMTALA"), as added by § 9121(b) of the Consolidated Omnibus Budget Reconciliation Act of 1985, 100 Stat. 164, and as amended, 42 U.S.C. § 1395dd.

Defendant Hospital filed a Motion To Dismiss on October 17, 1997, arguing that Plaintiffs did not state a claim under § 1395dd. In a June 30, 1998 Memorandum Opinion And Order ("Order"), the court granted Defendant Hospital's Motion To Dismiss Plaintiffs' claim under § 1395dd(b), but the court denied Defendant Hospital's Motion To Dismiss as to Plaintiffs' § 1395dd(a) claim. The court stated that "Plaintiffs' Complaint fail[ed] to specify exactly what their 'emergency medical condition' was. In addition, the Plaintiffs have failed to allege that the hospital knew of the condition." (*Id.* at 8–9.) Further, the court found that Plaintiffs' Complaint failed to "meet the first two prongs of a viable claim under § 1395dd(b)."

On July 14, 1998, Plaintiffs filed a Motion For Permission To Amend Complaint, wherein Plaintiffs alleged additional facts regarding their Complaint against Defendant Hospital. In their Amended Complaint,[6] Plaintiffs allege that, "they were seriously and severely injured in an auto-

---

5. Defendant Hospital claims that Plaintiffs were uncooperative and that the x-rays were limited. (Def.'s Ex. D.) As explained in Footnote 8, infra., the court finds that this fact is immaterial to a successful § 1395dd claim.

6. The court notes that Plaintiffs filed a Motion For Permission To Amend Complaint on July 24, 1998, wherein Plaintiffs alleged additional facts regarding their Complaint against De-

fendant Hospital. Plaintiffs did so in violation of Rule 15.1 of the United States District Court for the Middle District of Alabama Local Rules, which states in relevant part that "[a]ny amendment to a pleading ... must ... reproduce the entire pleading *as amended* ...." M.D. Ala. Local Rule 15.1 (emphasis added). Though the court took no action on this violation of Rule 15.1, the court cautions Plaintiffs against such future violations.

mobile accident." (Am.Compl.¶ 10.) After receiving a "cursory examination," Plaintiffs claim that Defendant Hospital discharged them despite the fact that "Plaintiff Gardner was bleeding and suffering from a broken jaw and broken ribs." (*Id.* ¶ 12.)

## DISCUSSION

### A. Purpose of the EMTALA

 EMTALA obligates hospitals and emergency rooms, when requested by an individual, to screen for and stabilize emergency medical conditions. *See Roberts v. Galen of Virginia, Inc.*, 525 U.S. 249, 119 S.Ct. 685, 142 L.Ed.2d 648 (1999) (per curiam). Congress enacted the EMTALA in response to a growing problem; namely, that hospitals were turning away, or "dumping," indigent, uninsured, and underinsured patients on other hospitals. *See In re Baby K*, 16 F.3d 590, 593 (4th Cir.1994) (citing *Brooks v. Maryland Gen. Hosp., Inc.*, 996 F.2d 708, 710 (4th Cir. 1993)). The purpose of the EMTALA is "to provide an 'adequate first response to a medical crisis' for all patients and 'send a clear signal to the hospital community … that all Americans, regardless of wealth or status, should know that a hospital will provide what services it can when they are truly in physical distress.'" *Baber v. Hospital Corp. of Am.*, 977 F.2d 872, 880 (4th Cir.1992) (quoting 131 Cong.Rec. S13904 (daily ed. Oct. 23, 1985) (statement of Sen. Bob Dole)); *see also Brooker v. Desert Hosp. Corp.*, 947 F.2d 412, 415 (9th Cir.1991) (holding that the EMTALA applies "to any and all patients"); *Gatewood v. Washington Healthcare Corp.*, 933 F.2d 1037, 1040 (D.C.Cir.1991) (same).

 The EMTALA accomplishes its purpose by "[i]mposing two duties on hospitals that have entered into Medicare provider agreements." *In re Baby K*, 16 F.3d at 593–94.

First, those hospitals with an emergency medical department must provide an appropriate medical screening to determine whether an emergency medical condition exists for any individual who comes to the emergency medical department requesting treatment. A hospital fulfills this duty if it utilizes identical screening procedures for all patients complaining of the same condition or exhibiting the same symptoms. An additional duty arises if an emergency medical condition is discovered during the screening process…. When an individual is diagnosed as presenting an emergency medical condition, the hospital must provide… that treatment necessary to prevent the material deterioration of the individual's condition or provide for an appropriate transfer to another facility.

*Id.* (internal footnotes and citations omitted). The EMTALA was intended to create a new claim distinct from traditional state malpractice causes of action. *See Summers v. Baptist Med. Ctr. Arkadelphia*, 91 F.3d 1132, 1137 (8th Cir.1996) (en banc) (citing *Gatewood*, 933 F.2d at 1041). The EMTALA was not intended, however, to create a federal malpractice law. *See Holcomb v. Monahan*, 30 F.3d 116, 117 (11th Cir.1994). Thus, the EMTALA does not impose a uniform level of care upon covered hospitals. *See Summers*, 91 F.3d at 1137. Nor does the EMTALA provide a cause of action against a hospital for misdiagnosis or negligent medical treatment. *See Holcomb*, 30 F.3d at 117.

### B. Plaintiffs' § 1395dd(a) EMTALA Claims

 The primary issue for purposes of § 1395dd(a) is whether Defendant Hospital provided Plaintiffs with the same screening that it provides other similarly situated patients. *See* 42 U.S.C. § 1395dd(a). Given both the purpose and rationale behind the EMTALA, the Eleventh Circuit has noted that the EMTALA "only requires a hospital to provide indigent patients with a medical screening similar to one which they would provide any other patient." *Holcomb*, 30 F.3d at 117. The First Circuit has defined the "appropriate medical screening requirement" more thoroughly, holding that:

A hospital fulfills its statutory duty to screen patients in its emergency room if it provides for a screening examination reasonably calculated to identify critical medical conditions that may be afflicting symptomatic patients and provides that level of screening uniformly to all those who present substantially similar complaints. The essence of this requirement is that there be some screening procedure, and that it be administered even-handedly. Therefore, a refusal to follow regular screening procedures in a particular instance contravenes the statute, but faulty screening, in a particular case, as opposed to disparate screening or refusing to screen at all, does not contravene the statute.

*Correa v. Hospital San Francisco*, 69 F.3d 1184, 1192–93 (1st Cir.1995). Moreover, "[s]ection 1395dd(a) is not designed to redress a negligent diagnosis by the hospital; no federal malpractice claims are created." *Holcomb*, 30 F.3d at 117.

■■■■■ Accordingly, when examining a failure to screen claim under § 1395dd(a), a court should look at whether the hospital applied the screening procedures that the hospital applies to all patients showing the same symptoms as the patient presenting him or herself to the emergency room. *Id.* Moreover, summary judgment is proper if a plaintiff fails "to show the hospital treated [plaintiff] differently from other patients, an essential element of a claim under § 1395dd(a)." *Williams v. Birkeness*, 34 F.3d 695, 697 (8th Cir.1994).

■■■ In the present action, Defendant Hospital argues that Plaintiffs received appropriate medical screenings at Defendant Hospital. (Def.'s Mem. at 8.) In support of this proposition Defendant Hospital submits two affidavits, which are uncontroverted by Plaintiffs. Specifically, Nurse Charlotte Patterson, who was on duty the night Plaintiffs were admitted by Defendant Hospital, states in her affidavit that the "medical assessments, screenings, diagnostic tests and treatment given to [Plaintiffs] . . . were the same . . . that [Defendant Hospital] provided and pro-

vides to all patients presenting to the emergency room with similar symptoms, complaints and injuries." (Def.'s Ex. B at 3.) Similarly, Dr. John M. Garrison, the attending physician at Defendant Hospital on the night in question, states in his affidavit that the "screenings . . . provided to [Plaintiffs] . . . were the same . . . provided to all patients presenting to the emergency room with similar symptoms, complaints and injuries." (Def.'s Ex. C at 2.)

From this proffer, the court finds that Defendant Hospital, as the moving party, has met its initial burden of stating the basis for its motion and identifying those portions of the record which show an absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. Thus, Plaintiffs are required by Rule 56(e) to "set forth *specific facts* showing there is a genuine issue for trial." Fed.R.Civ.P. 56(e) (emphasis added); *see also Celotex*, 477 U.S. at 324, 106 S.Ct. 2548.

The court finds that Plaintiffs fail to meet their burden of production. In response to Defendant Hospital's Motion, Plaintiffs merely claim that "[t]he medical records pertaining to Plaintiffs clearly indicate that the hospital performed a mere cursory examination and failed to screen them properly." (Pl.'s Br. at 4.) A blanket reference to a portion of the record is not enough to support Plaintiffs' claim. *See Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. Here, the Plaintiffs do not point to any specific aspect of their medical records in their Response To Defendant's Motion For Summary Judgment.

Despite Plaintiffs failure to direct the court to specific aspects of the medical records, the court examines Plaintiffs' medical records and finds that the records support Defendant's Motion. Viewing the facts in the light most favorable to the Plaintiffs, the court finds that Defendant Hospital took Plaintiffs' vital signs at least four times, interviewed them about their injuries and medical history, took several x-rays, and gave Plaintiff Gardner an

EKG.[7] (Def.'s Ex. D.) Further, the medical records state that Plaintiffs Newman and Gardner were "ambulatory" and "stable," respectively, upon discharge. (*Id.*)

Plaintiffs also argue that "[t]he history given to the hospital about each Plaintiff was a motor vehicle accident, with possible head trauma and loss of unconsciousness [sic]. Yet, the testing performed by Defendant [H]ospital failed to disclose facial and rib fractures in either Plaintiff." (Pl.'s Br. at 4.) Taking all of this as true, the court finds that Plaintiffs still fail to meet their burden of production to overcome summary judgment. The court notes that Plaintiffs must set forth facts which support the proposition that the treatment given to them by Defendant Hospital was not the treatment given to similarly situated patients. *See Williams*, 34 F.3d at 697. Plaintiffs fail to provide such evidence.

Further, although it seems clear from the record that Plaintiffs were diagnosed with serious injuries at Baptist, Defendant Hospital's failure to discover said injuries does not impact whether the screening techniques used by Defendant Hospital were proper.[8] While at Baptist, both Plaintiffs were diagnosed with facial fractures. (Am.Compl.¶ 12.) Plaintiff Gardner had to be hospitalized for a period of time to treat his injuries. (Pls.' Baptist Med. R.'s.) The fact that Baptist discovered injuries that were not discovered by Defendant Hospital is not relevant to whether Defendant Hospital failed to properly screen Plaintiffs under § 1395dd(a). Baptist's discovery of said injuries may demonstrate a failure by Defendant Hospital to diagnose, but § 1395dd(a) does not offer redress for such situations. *See Holcomb*, 30 F.3d at 117. Furthermore, Plaintiffs do not allege that the screening

offered by Baptist was in any way different than that offered by Defendant Hospital. Plaintiffs only show that the two screenings resulted in differing diagnoses. The court finds that this evidence, without more, does not support Plaintiffs' § 1395(a) claim.

Based on the foregoing, the court finds that Plaintiffs fail to provide or specify any support for their claim that they were treated differently from other patients. *Id.* Upon considering the foregoing facts, Defendant Hospital's affidavits, and Plaintiffs' failure to offer contrary evidence, this court finds that the evidence supports summary judgment for Defendant Hospital on Plaintiffs' § 1395dd(a) claim.

### C. Plaintiffs' § 1395dd(b) EMTALA Claims

In its Motion, Defendant Hospital cites the court's June 30, 1998 Order dismissing Plaintiffs' claims under 42 U.S.C. § 1395dd(b). (Def.'s Mem. at 2.) While Defendant Hospital notes that Plaintiffs filed an Amended Complaint on July 1, 1999, wherein Plaintiffs allege additional facts, Defendant Hospital does not address § 1395dd(b) in its Motion For Summary Judgment. The Court construes Defendant Hospitals's treatment of § 1395dd(b) to indicate that Defendant believes that Plaintiffs fail to resurrect their § 1395dd(b) claim, despite Plaintiffs' Amended Complaint.

In its Order, the court found that Plaintiffs failed "to specify exactly what their 'emergency medical condition' was ... [and] failed to allege that the hospital knew of the condition." (Order at 9.) The court notes that Plaintiff filed their Amended Complaint shortly after the court dismissed the § 1395dd(b) claim.[9]

---

7. The Court also finds that Plaintiffs went through similar screening at Baptist Medical Center. (Pls.'s Baptist Med. R.'s) At Baptist, the hospital took Plaintiffs' medical history, vital signs, and x-rays. (*Id.*)

8. The issue of Defendant Hospital's negligence is not before the court, and this Opinion in no way reflects a decision on said issue. The court notes, though, that Plaintiffs' Com-

plaint and Amended Complaint and the facts asserted therein sound of negligence. However, facts regarding Plaintiffs' treatment at Defendant Hospital, while possibly supporting a claim for negligence, do not support Plaintiffs' medical screening claim.

9. The court further notes that the dismissal of Plaintiffs' § 1395dd(b) claim was without prejudice.

Although the Amended Complaint did not specifically state that its purpose was to remedy the dismissal of the § 1395dd(b) claim, it appears to the court that Plaintiffs intended that the Amended Complaint serve that purpose.

In their Amended Complaint, Plaintiffs allege that "they were seriously and severely injured in an automobile accident." (Am.Compl.¶ 10.) After receiving a "cursory examination," Plaintiffs aver that Defendant Hospital discharged Plaintiffs despite the fact that "Plaintiff Gardner was bleeding and suffering from a broken jaw and broken ribs." (*Id.* ¶ 12.) However, the court finds that Plaintiffs' Amended Complaint fails to correct the deficiencies which led to the dismissal of Plaintiffs' § 1395dd(b) claim.

Section 1395dd(b) requires that after a hospital determines that a person suffers from an "emergency medical condition," it must provide whatever treatment, within its capabilities, is needed to stabilize the condition before discharging the patient. 42 U.S.C. § 1395dd(b); *see also Holcomb*, 30 F.3d at 117. Success on a § 1395dd(b) claim requires Plaintiffs to show that: (1) they had an emergency medical condition; (2) the hospital knew of the condition; (3) the patient was not stabilized before being discharged; and (4) the hospital neither obtained the patient's consent to transfer nor completed a certificate indicating the transfer would be beneficial to the patient and was appropriate. *See Id.* An emergency medical condition is defined as:

> [A] medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—placing the health of the individual. . . in serious jeopardy, serious impairment to bodily functions, or serious dysfunction of any bodily organ or part.

42 U.S.C. § 1395dd(e)(1)(A). Plaintiffs' Amended Complaint alleges serious and severe injury, including bleeding and broken bones on the part of Plaintiff Gardner.

(Am.Compl.¶ 12) Assuming without deciding that Plaintiffs' allegations qualify under the aforementioned definition of emergency medical condition, the court finds that the Amended Complaint still fails to allege that Defendant Hospital knew of Plaintiffs' condition.

It is clear from the record that both Plaintiffs appeared to be injured and in pain upon discharge. (Newman Dep. at 65.) Defendant Hospital explains this condition, however, with its diagnosis of "multiple soft-tissue trauma." (Def.'s Ex. D.) The court finds, however, that the fact that Plaintiffs' injuries proved to be much more serious than Defendant Hospital believed them to be does not impact Defendant Hospital's liability under § 1395dd(b). The court finds that Plaintiffs Complaint fails to state a claim pursuant to § 1395dd(b) because it fails to allege or provide any support for a claim that Defendant Hospital knowingly discharged Plaintiffs without stabilizing their injuries.

Moreover, the court notes that Plaintiffs contradict themselves in their own pleadings. While in their Amended Complaint, Plaintiffs aver that Plaintiff Gardner was bleeding when released from Defendant Hospital, Plaintiffs also rely upon their medical records, which clearly state that Plaintiffs left the hospital "stabilized," "unaided," and ambulatory. (*Id.*) This is in direct conflict with the third prong of § 1395dd(b), which requires the Plaintiffs show that they were not stabilized before being discharged. *See* 42 U.S.C. § 1395dd(b).

Thus, the court finds that Plaintiffs failed to properly amend their Complaint to include a cause of action under § 1395dd(b). Therefore, it is unnecessary for the court to address such claim on summary judgment.

### ORDER

Based on the foregoing, it is CONSIDERED and ORDERED that Defendant Hospital's Motion For Summary Judgment be and the same is hereby GRANTED and

that Plaintiffs' 42 U.S.C. § 1395dd claims against Defendant Hospital be and the same are hereby DISMISSED.