Jane **ROBERTS**, as Guardian for Wanda Y. Johnson, Plaintiff–Appellant,

v.

**GALEN OF VIRGINIA, INC.,** formerly d/b/a Humana Hospital University of Louisville, d/b/a University of Louisville Hospital, Defendant–Appellee.

No. 96–5298.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 6, 1997.

Decided April 9, 1997.

---

Joseph H. Mattingly, III (argued and briefed), Lebanon, KY, for Plaintiff–Appellant.

Bryan Todd Thompson (argued and briefed), Hirn, Doheny & Harper, Louisville, KY, for Defendant–Appellee.

Before KENNEDY, NELSON, and VAN GRAAFEILAND, Circuit Judges.*

KENNEDY, J., delivered the opinion of the court, in which VAN GRAAFEILAND, J., joined. NELSON, J. (pp. 413–14), delivered a separate opinion concurring in part and dissenting in part.

KENNEDY, Circuit Judge.

Plaintiff, Jane Roberts, appeals the District Court's order granting summary judgment for the defendant in this action under the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd. Plaintiff alleges that her critically-ill niece, Wanda Johnson, was transferred from the defendant hospital to a nursing care facility in an unstable condition in violation of the Emergency Medical Treatment and Active Labor Act. For the reasons set forth below, we **AFFIRM** the judgment of the District Court.

## I.

Wanda Johnson was hospitalized at Humana Hospital–University of Louisville ("Humana") on May 19, 1992 after sustaining mas-

---

* The Honorable Ellsworth A. Van Graafeiland, Circuit Judge of the United States Court of Appeals for the Second Circuit, sitting by designation.

sive severe injuries caused by a collision with a truck. A few weeks before July 22, 1992, the surgical resident treating Johnson requested a Humana social worker to search for a long term care facility for Johnson. While the social worker, Nancy Fred, was aware Johnson had no insurance, the resident who authorized her discharge had no such knowledge. On July 22, 1992, after two nursing homes turned Johnson down following on-site evaluations of her condition by their directors of nursing, a representative of Crestview Health Care Facility in the State of Indiana agreed to take Johnson. She was transferred to Crestview on July 24, 1992.

The day after Johnson's arrival at Crestview, Johnson's condition deteriorated significantly. She was taken to Midwest Medical Center, also in Indiana, where she remained for many months incurring $388,679.93 in medical bills. The State of Indiana rejected Johnson's application for medical assistance under the Indiana Medicaid Program because she failed to meet the Indiana residency requirements.

On August 30, 1993, plaintiff, as guardian for Wanda Johnson, filed this action under the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, alleging that Humana failed to comply with EMTALA in the transfer of Johnson to a skilled nursing facility. Plaintiff also alleged in her complaint that Humana violated the Due Process and Equal Protection Clauses of the United States and Kentucky Constitutions and that Humana should be liable for negligence under state law for the acts of the medical residents responsible for Johnson's care. Humana filed a motion for summary judgment on all of plaintiff's claims.

The District Court initially denied Humana's motion for summary judgment on the EMTALA claim because it found there was a genuine issue of material fact as to whether Johnson was stabilized before she was transferred to Crestview and because there was a genuine issue of material fact as to whether Humana acted with an improper motive. The District Court granted Humana's motion on the remaining claims. Regarding the state law negligence claim, the District Court

held that the hospital could not be liable for the actions of its residents because the residents were not ostensible agents of the hospital. Humana moved for reconsideration of the EMTALA claim. On reconsideration, the District Court held that, despite the existence of genuine issues of material fact as to stabilization and improper motive, plaintiff failed to prove that "either the medical opinion that Johnson was stable or the decision to authorize her transfer was caused by an improper motive." Thus, on reconsideration, the District Court granted Humana's motion for summary judgment on the EMTALA claim. Plaintiff appeals solely from the disposition of the EMTALA claim and the District Court's conclusion that the residents were not ostensible agents of the hospital.

## II.

This Court's review of a grant of summary judgment is *de novo;* we use the same test used by the District Court. *See Brooks v. American Broadcasting Cos.*, 932 F.2d 495, 500 (6th Cir.1991). In reviewing summary judgment motions, courts must view the evidence in the light most favorable to the nonmoving party to determine whether a genuine issue of material fact exists. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). Under FED.R.CIV.P. 56(c), summary judgment is proper if the evidence " 'show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to [a] judgment as a matter of law.' " *Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc.*, 862 F.2d 597, 601 (6th Cir.1988)(quoting Fed.R.Civ.P. 56(c)).

## III.

### A.

■ The Emergency Medical Treatment and Labor Act, 42 U.S.C. § 1395dd, in pertinent part, provides:

> If any individual (whether or not eligible for benefits under this subchapter) comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either—

(A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or

(B) for transfer of the individual to another medical facility in accordance with subsection (c) of this section.

42 U.S.C. § 1395dd(b)(1). As defined by the EMTALA, "to stabilize" under subsection (b)(1)(A) means, "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility ..." 42 U.S.C. § 1395dd(e)(3)(A). As explained by our Court in *Cleland v. Bronson Health Care Group, Inc.*, 917 F.2d 266 (6th Cir.1990):

> the impetus to this legislation came from highly publicized incidents where hospital emergency rooms [1] allegedly, based only on a patient's financial inadequacy, failed to provide a medical screening that would have been provided a paying patient, or transferred or discharged a patient without taking steps that would have been taken for a paying patient.

*Id.* at 268. Although the legislative history suggests otherwise, the EMTALA applies to all patients regardless of their financial status. *Id.*

The dispute in this case arises out of the District Court's conclusion that our Court's decision in *Cleland* requires that plaintiff prove the hospital acted with an improper motive in order to recover under the EMTALA. Specifically, the District Court concluded and the defendant contends that merely transferring a patient before the patient is sufficiently stabilized does not constitute a violation of EMTALA; rather, plaintiff must prove that the hospital acted with an improper motive when it failed to stabilize the pa-

tient before transfer. In *Cleland*, parents of a fifteen-year-old boy took their son to an emergency room complaining of cramps and vomiting. A doctor at the hospital examined the boy, diagnosed influenza, and discharged the patient four hours later. *Cleland*, 911 F.2d at 268. Less than twenty-four hours after he was discharged, the boy died of cardiac arrest caused by intussusception.[2] The district court dismissed the parents' cause of action under EMTALA because the court concluded that the EMTALA applied only to indigent patients. This Court affirmed the dismissal of the complaint, but on different grounds. *Id.*

In analyzing whether the Clelands' claim was properly dismissed, this Court first noted that the parents did not allege that the care provided to their son was deficient or that the hospital's actions in connection with their son's screening and stabilization was in any way different than the care that would have been offered to any other patient. *Id.* at 269. Our Court then sought to define the terms "appropriate medical screening" and "emergency medical condition" which appear in subsection (a) of EMTALA in order to determine whether the Clelands' claim could survive despite their admission that their son's treatment was not disparate or insufficient but simply wrong. Subsection (a) of EMTALA states:

> In the case of a hospital that has a hospital emergency department, if any individual ... comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an *appropriate medical screening examination* within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an *emergency medical condition* ... exists.

---

**1.** As concluded by our Court in *Thornton v. Southwest Detroit Hospital*, 895 F.2d 1131 (6th Cir.1990), EMTALA's application is not limited to a patient's treatment and discharge from an emergency room. Rather, "once a patient is found to suffer from an emergency medical condition in the emergency room, she cannot be discharged until the condition is stabilized, re-

gardless of whether the patient stays in the emergency room." *Id.* at 1134.

**2.** The slipping of one part of an intestine into another part just below it. TABER'S CYCLOPEDIC MEDICAL DICTIONARY I–35 (9th ed.1963).

42 U.S.C. § 1395dd(a)(emphasis added). The court refused to interpret the term "appropriate" as referring to a malpractice or other standard of care. Instead, we concluded that the term "appropriate" refers "to the motives with which the hospital acts." *Cleland,* 917 F.2d at 272. The court further explained, "If it acts in the same manner as it would have for the usual paying patient, then the screening provided is 'appropriate' within the meaning of the statute." *Id.*

Addressing the concern that this approach might "constitute a backdoor means of limiting coverage to the indigent or uninsured," this Court commented:

> . . . A hospital that provides a substandard (by its standards) or nonexistent medical screening for any reason (including, without limitation, race, sex, politics, occupation, education, personal prejudice, drunkenness, spite, etc.) may be liable under this section. Similarly, a discharge that to the knowledge of those conducting it left a patient with an "emergency medical condition" in an "unstable" condition would be actionable.
>
> We can think of many reasons other than indigency that might lead a hospital to give less than standard attention to a person who arrives at the emergency room. These might include: prejudice against the race, sex, or ethnic group of the patient; distaste for the patient's condition (e.g., AIDS patients); personal dislike or antagonism between the medical personnel and the patient; disapproval of the patient's occupation; or political or cultural opposition. If a hospital refused treatment to a person for any of these reasons, or gave cursory treatment . . . the patient would fall squarely within the statutory language.

*Id.* Because the parents did not allege that their son was treated differently than any other patient, we affirmed the district court's dismissal of their claim. *Id.*

The District Court in the instant case properly interpreted the *Cleland* holding as requiring that a plaintiff prove a hospital acted with an improper motive in order to recover under the EMTALA. As noted by the United States Court of Appeals for the Fourth Circuit, "EMTALA is not a substitute for state law malpractice actions, and was not intended to guarantee proper diagnosis or to provide a federal remedy for misdiagnosis or medical negligence." *Power v. Arlington Hosp. Ass'n,* 42 F.3d 851, 856 (4th Cir.1994); *see also Summers v. Baptist Medical Ctr. Arkadelphia,* 91 F.3d 1132, 1137 (8th Cir. 1996); *Correa v. Hospital San Francisco,* 69 F.3d 1184, 1192 (1st Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1423, 134 L.Ed.2d 547 (1996); *Eberhardt v. City of Los Angeles,* 62 F.3d 1253, 1258 (9th Cir.1995); *Repp v. Anadarko Mun. Hosp.,* 43 F.3d 519, 522 (10th Cir.1994); *Holcomb v. Monahan,* 30 F.3d 116, 117 (11th Cir.1994). To distinguish an EMTALA claim from a state law claim for negligence, a plaintiff must establish something more than a hospital's breach of the applicable standard of care. We reject the position espoused by plaintiff that, to succeed on a claim under the EMTALA, she can prove that Humana's treatment of Johnson was not uniform to patients suffering from the same medical condition as Johnson. Proof of disparate treatment, in plaintiff's view, distinguishes an EMTALA claim from a state law negligence claim. If we were to adopt this position, however, we would effectively require a hospital, in defense of a claim under EMTALA, to either prove that it breached a standard of care to an individual patient or that it breaches the applicable standard of care with respect to all similarly situated patients. In other words, we would require a hospital to prove that it has committed medical negligence or malpractice. In order to prevent placing hospitals in such a precarious position, we declined in *Cleland* to adopt such an approach. Instead, *Cleland* imposed upon the plaintiff a burden to bring forth some showing of improper motivation. As explained in *Cleland,* a plaintiff is not limited to a showing of an improper motivation involving indigency or lack of insurance. Rather, other improper reasons include race, sex, politics, occupation, education, personal prejudice, drunkenness, or spite; that is, anything except medical negligence. *Cleland* requires proof of the existence of any improper motivation such as those listed above to make out a case of inappropriate screening

or improper discharge.[3] To interpret *Cleland* in any other manner would effectively reduce the EMTALA to nothing more than a federal remedy for medical malpractice.[4]

### B.

With these requirements in mind, we turn to the question of whether Ms. Johnson was stabilized before she was transferred to Crestview. *Cleland* guides us in analyzing a stabilization case. As with appropriate medical screening, the doctors are not charged with the duty under EMTALA of proper diagnosis; rather, they are charged with the duty of stabilizing a patient's condition as it as known to them. *Cleland,* 917 F.2d at 271. As noted by the District Court, there is a genuine issue of material fact as to this question. The day before Johnson was transferred, Johnson developed the symptoms of a urinary tract infection which were known to and treated by her physicians, but Johnson was transferred before doctors at Humana could determine whether the infection would respond to the antibiotic prescribed.

Drs. Richardson, Harbrecht, and Abou–Jaoude, the physicians involved in Johnson's care, attested that Johnson's condition was sufficiently stable to warrant discharge. Lynette Ferguson, Crestview's Director of Nursing, assessed Johnson's condition approximately two hours after her arrival. In her opinion, Johnson's condition was suffi-

ciently stable to be treated at Crestview. Dr. Taiser Shatara, Johnson's admitting physician at Crestview, testified that, based on the information he had learned from the nurses at Humana, he believed that Johnson was an appropriate candidate for nursing home placement and stable when transferred. However, he testified that, had he known of the full history of Johnson's hospitalization, her suspected urinary tract infection, and elevated white count, he would not have accepted her as a patient at Crestview. Dr. John Stuy testified that, in his opinion, Johnson should have remained at Humana until her doctors could review the results of the culture and determine whether the prescribed antibiotic would have successfully treated the infection.

In addition to this conflicting testimony, there is a dispute as to whether Johnson's condition was stabilized upon transfer but worsened by Crestview's insufficient treatment of Johnson. Most significantly, contrary to instructions given by Humana, Crestview staff did not suction Johnson's lungs nearly as often as recommended.

Humana has not appealed the District Court's holding that there is a genuine issue of material fact regarding whether Johnson was stabilized when she was discharged from Humana.

---

**3.** *Cleland* defined the term "appropriate medical screening" and in doing so inserted examples of improper motives. Notably, the term "appropriate medical screening" appears in subsection (a) of EMTALA not subsection (b), the subsection at issue in this case. However, *Cleland* specifically noted, after setting forth examples of improper motive, that "[s]imilarly, a discharge that to the knowledge of those conducting it left a patient with an 'emergency medical condition' in an 'unstable' condition would be actionable." *Cleland* at 272. Moreover, we see no rational reason to set forth differing standards when applying subsection (a) and (b).

**4.** We, therefore, reject the approach of the Fourth Circuit taken in *In the Matter of Baby "K",* 16 F.3d 590 (4th Cir.1994). In *In the Matter of Baby "K",* a hospital sought a declaratory judgment that it was not required under the EMTALA to provide respiratory support for a baby with anencephaly when presented to the hospital in respiratory distress. *Id.* at 592. The hospital contended that because aggressive treat-

ment, such as respiratory support, would not serve any purpose, it was obligated only to provide the supportive care of nutrition, hydration, and warmth. *Id.* The hospital argued that the EMTALA required it only to provide the baby the same care it would provide to other babies suffering from anencephaly—nutrition, hydration, and warmth. The court disagreed.

In the court's opinion, the statutory language of EMTALA is clear and it does not "allow the Hospital to fulfill its duty to provide stabilizing treatment by simply dispensing uniform treatment. Rather, the Hospital must provide that treatment necessary to prevent the material deterioration of each patient's emergency medical condition." *Id.* at 596. The court thus concluded that the hospital's uniform treatment of providing warmth, nutrition, and hydration was insufficient to avoid liability under EMTALA. Rather, the hospital was obligated to provide the treatment necessary to prevent the material deterioration of Baby K's condition which included respiratory support. *Id.*

## C.

■ Our analysis, however, does not cease with the conclusion that there exists a genuine issue of material fact regarding whether Johnson was stabilized when she was discharged from Humana. We must additionally determine, pursuant to *Cleland,* whether Humana acted with an improper motive when it discharged Johnson.

Joanna Nolte, a representative of Crestview Health Care Facility, testified that Nancy Fred explained to her "they had been trying to discharge and without any avail to other facilities and that she was getting a lot of pressure to discharge this person due to they knew they weren't going to get paid for this person." Nolte testified that Fred did not specifically mention who was placing pressure on her to discharge Wanda, she said "she was just receiving pressure from the hospital that, you know, that we needed—that she needed to find placement for this person." As acknowledged by the District Court, this statement suggests that some representative of the hospital may have been acting with an improper motive. However, as the District Court also concluded, there is no evidence that this improper motive caused Dr. Abou–Jaoude to issue Johnson's discharge order. Fred played no role in diagnosing Johnson as stabilized at the time of discharge. Even assuming financial considerations influenced Ms. Fred when pursuing a placement for Johnson, plaintiff has brought forth nothing more than speculation in support of her theory that the discharge papers were signed before Johnson was stabilized due to inappropriate economic considerations.

In support of its motion for summary judgment, defendant submitted the affidavits of Dr. David Richardson, Dr. Brian Harbrecht, and Dr. Abou–Jaoude. Dr. Richardson attested that he participated in Johnson's care and was certain that her financial condition was not a consideration in the medical decision to discharge her. Dr. Harbrecht attested that he consulted in and approved of Johnson's discharge and that her financial status played no role. Dr. Abou–Jaoude similarly attested that he was unaware of Johnson's financial status when he wrote the discharge order and that her financial status was not a factor in his decision to write the order. Moreover, Frank M. Miller, Chief of the Surgical Intensive Care Unit and Chief of the Department of Surgery at Humana, testified that the attending physicians and residents "never have any idea what the financial condition of the patient is." In response, plaintiff brought forth no evidence suggesting that Johnson's treating physicians were aware of Johnson's financial condition. Thus, plaintiff failed to create a genuine issue of material fact as to causation. Without some evidence of a causal relation between the hospital employee possessing the improper motive and the discharge of the unstable patient, a plaintiff can not establish that a patient's discharge was caused by an improper motive. Accordingly, the District Court properly granted defendant summary judgment on plaintiff's claim under the EMTALA.

## IV.

In addition to the EMTALA claim, plaintiff brought a state law negligence claim against Humana for the acts of the surgical residents who treated Johnson. In order to hold the hospital liable for the negligent acts of the surgical residents, plaintiff argued they were ostensible agents of the hospital. The District Court held that the surgical residents at Humana were not ostensible agents and, therefore, granted summary judgment on behalf of Humana on the state law claim.

As noted by the District Court, Kentucky courts have relied heavily on the manner in which the principal holds itself out to the public in determining whether an ostensible agency or apparent authority relationship exits. In *Williams v. St. Claire Medical Center,* 657 S.W.2d 590 (Ky.Ct.App.1983), the court relied on the following definitions of ostensible agency:

> Apparent authority is not actual authority, but rather "is that which, by reason of prevailing usage or other circumstance, the agent is in effect held out by the principal as possessing. It is a matter of appearances, fairly chargeable to the principal and by which persons dealt with are deceived, and on which they rely."

*Id.* at 595 (quoting *Estell v. Barrickman,* 571 S.W.2d 650, 652 (Ky.Ct.App.1978)).

> One who represents that another is his servant or other agent and thereby causes a third person justifiably to rely upon the care or skill of such apparent agent is subject to liability to third person for harm caused by the lack of care or skill of the one appearing to be a servant or other agent as if he were such.

*Id.* at 595–96 (quoting The Restatement (Second) of Agency § 267 (1958)). Because the hospital in *Williams* did nothing to inform the plaintiff that a nurse, an independent contractor whose actions were alleged to be negligent, was something other than a hospital employee, the "hospital 'held-out' [the nurse] as an employee, thus creating an apparent agency." *Id.* at 596.

In *Paintsville Hospital Co. v. Rose,* 683 S.W.2d 255 (Ky.1985), the Supreme Court of Kentucky specifically addressed the question of whether a hospital could be liable for the negligence of an emergency room physician who was not employed by the hospital. In a case where the hospital did nothing to alert the public that its emergency room physicians were not hospital employees, the court concluded that it is "unreasonable to put a duty on the patient to inquire of each person who treats him whether he is an employee or independent contractor of the hospital." *Id.* at 258 (citations omitted). The court further relied on the following statements from other courts on this issue in concluding that a hospital may be liable for the negligent acts of an independent emergency room physician:

> Absent notice to the contrary, therefore, plaintiff had the right to assume that the treatment received was being rendered through hospital employees and that any negligence associated with that treatment would render the hospital responsible. *Arthur v. St. Peters Hospital,* 169 N.J.Super. 575, 405 A.2d 443, 447 (1979).

> In our view, the critical question is whether the plaintiff, at the time of his admission to the hospital, was looking to the hospital for treatment of his physical ailments or merely viewed the hospital as the situs where his physician would treat him for his problems. *Grewe v. Mt. Clemens General Hospital,* 404 Mich. 240, 273 N.W.2d 429, 433 (1978).

*Id.* at 258.

Lastly, in *Floyd v. Humana of Virginia,* 787 S.W.2d 267 (Ky.Ct.App.1989), the Kentucky Court of Appeals addressed the ostensible agency issue in a case where the patient had signed a form indicating that doctors in the hospital were independent contractors. In light of this evidence, the court concluded:

> we find the testimony of the appellant admitting that she had read and signed each of the admission forms to Humana of Virginia Hospital, Inc. d/b/a Humana Hospital University, which indicates her knowledge that the doctors were independent contractors and not agents of the hospital, to be determinative in this case. There was no representation or other action to induce appellant to believe that the physicians were employees or agents of Humana Hospital University; in addition, the admission form which appellant signed specially indicated same. Accordingly, there can be no valid argument that the ostensible agency doctrine would make Humana of Virginia liable in this case.

*Id.* at 270 (citing *Williams v. St. Claire Medical Center,* 657 S.W.2d 590 (Ky.Ct.App. 1983)).

■ In the case at hand, Humana's outpatient registration and authorization for medical treatment form states:

INDEPENDENT STATUS OF PHYSICIANS, RESIDENTS AND MEDICAL STUDENTS

The medical treatment rendered to you during your hospital admission will be provided by physicians, residents and medical students (under the supervision of physicians and/or residents). These physicians, residents, and medical students are independent practitioners and are not employees or agents of the hospital.

In addition, certain professional services rendered to you during your hospital admission will be provided by physicians, residents and medical students who are independent practitioners and are not employees or agents of Humana Hospital—

University of Louisville. These services include but are not limited to the following: Radiology, Anesthesiology, Emergency Room, Pathology.

The physicians providing treatment to you and the physicians providing the above mentioned professional services are not employees or agents of Humana Hospital - University of Louisville.

The record indicates that a form with this wording was specifically drafted for Johnson[5] on May 20, 1992 at 1:00 a.m., shortly after she arrived at the hospital. The form, however, was not signed by Johnson presumably because she was physically unable to do so. Thus, we are faced with a case where a hospital has overtly represented that its physicians are not its agents but where the patient has not seen or acknowledged the disclaimer. Whether or not Johnson read or signed the disclaimer is not dispositive. If it were dispositive, patients too critical to sign the consent form could sue residents for negligence whereas those able to read and sign the form could not. As stressed by Kentucky case law, the result should, instead, turn on whether the hospital holds its physicians out to be employees or something else. The passages cited to approvingly by the Kentucky courts focus particularly on the actions of the hospital. As noted by *Williams v. St. Claire Medical Center*, 657 S.W.2d 590 (Ky.Ct.App.1983), "apparent authority is not actual authority, but rather 'is that which, by reason of prevailing usage or other circumstance, the agent is in effect held out by the principal as possessing. It is a matter of appearances, fairly chargeable to the principal and by which persons dealt with are deceived, and on which they rely.'" *Id.* at 595 (quoting *Estell v. Barrickman*, 571 S.W.2d 650, 652 (Ky.Ct.App.1978)). And, as defined by the Restatement,

> One who represents that another is his servant or other agent and thereby causes a third person justifiably to rely upon the care or skill of such apparent agent is subject to liability to third person for harm caused by the lack of care or skill of the

one appearing to be a servant or other agent as if he were such.

*Id.* at 595–96 (quoting The Restatement (Second) of Agency § 267 (1958)). Thus, under Kentucky law the actions of the hospital, rather than the knowledge of the patient, is controlling in a case where the patient is unable to obtain actual knowledge of the hospital's disclaimer. Here, Humana clearly attempted to alert the public that its physicians were not employees or agents of the hospital. The District Court, therefore, properly concluded that the surgical residents were not ostensible agents of the hospital. Accordingly, the dismissal of plaintiff's state law negligence claim is affirmed.

## V.

For the foregoing reasons, the judgment of the District Court is **AFFIRMED**.

DAVID A. NELSON, Circuit Judge, concurring in part and dissenting in part.

I agree with the court's disposition of Mrs. Johnson's negligence claim. As explained in Part IV of Judge Kennedy's opinion, the surgical residents could not properly be found to have been ostensible agents of defendant Humana—and absent an agency relationship, the residents' alleged negligence could not properly be imputed to Humana.

I disagree with the court's disposition of Mrs. Johnson's claim under the Emergency Medical Treatment and Active Labor Act. A covered hospital that is acting from an improper motive is prohibited by the Act from discharging a patient such as Mrs. Johnson for transfer to another facility without first having stabilized her medical condition. Stabilization has not been achieved if the transfer is likely to result in material deterioration of the patient's condition. Like my colleagues on the panel, I believe that there is a genuine issue of fact as to whether Mrs. Johnson was stabilized at the time of her transfer from Humana to the Crestview facility. Unlike my colleagues, I believe that there is also a genuine issue of fact as to whether Humana acted from an improper

---

**5.** Neither the parties nor the record indicate why an outpatient, rather than an inpatient, form was    drafted for Johnson.

motive. The issue is a material one, under our case law, so it seems to me that summary judgment ought not to have been granted on the statutory claim.

As far as the record discloses, to be sure, Dr. Abou–Jaoude—the physician who issued Mrs. Johnson's discharge order—was not knowingly influenced by improper financial considerations when he decided that it was appropriate for Mrs. Johnson to be discharged. But as Dr. Abou–Jaoude made clear in his deposition testimony, the discharge decision was not made in a vacuum. Mrs. Johnson was a "high-risk" patient who needed "skilled nursing care," Dr. Abou–Jaoude testified. He clearly would not have discharged her had he thought she was going to a boarding house, for example. The doctor talked to social worker Nancy Fred "multiple times" about Mrs. Johnson's discharge plan, and he engaged in "frequent discussions" with Ms. Fred about where Mrs. Johnson was going to go and who was going to take care of her. He specified placement in a skilled nursing care facility, according to his testimony, and he assumed that the social workers would locate a facility with nurses who could take care of the patient. As far as selection of a specific placement was concerned, Dr. Abou–Jaoude testified, "we just left it in the hands of the social workers. . . ."

The social workers' hands may not have been as clean as the doctor's apparently were. There is evidence from which a jury could infer that Ms. Fred was receiving pressure from Humana's administration to get Mrs. Johnson discharged, there being no prospect that Humana would ever be paid for taking care of this patient. There is evidence from which a jury could infer that the Crestview facility was not an appropriate placement for Mrs. Johnson. And given the extent to which Dr. Abou–Jaoude relied on Ms. Fred to locate a facility to which Mrs. Johnson could be transferred without any material deterioration in her condition, it seems to me that it would be permissible for a jury to find that rather than letting Mrs. Johnson stay put until an appropriate placement could be found elsewhere, Humana sent Mrs. Johnson to an inappropriate facility because Humana was not being paid. Such a finding would make Humana liable under the Act. Accordingly, I respectfully dissent from affirmance of the summary judgment for Humana on Mrs. Johnson's statutory claim.