RENDERED: APRIL 30, 2020
TO BE PUBLISHED



# Supreme Court of Kentucky

E 5-28-2020

## 2019-SC-000048-DG

JASSICA SNEED                                     APPELLANT

                   ON REVIEW FROM COURT OF APPEALS
V.                        CASE NO. 2017-CA-001069-MR
             JEFFERSON CIRCUIT COURT NO. 14-CI-004064

UNIVERSITY OF LOUISVILLE HOSPITAL;              APPELLEES
DR. TANYA FRANKLIN;
AND
DR. JENNIFER FORD ALLEN

## OPINION OF THE COURT BY JUSTICE KELLER

### **AFFIRMING**

Jassica Sneed was admitted to the University of Louisville Hospital ("Hospital") on August 1, 2013 in active labor. She delivered her baby the next day under the care of Doctors Tanya Franklin and Jennifer Ford Allen. During her delivery, Sneed suffered a fourth-degree laceration. Two weeks later she was diagnosed with a rectovaginal fistula. She eventually filed claims against the Hospital and various doctors and nurses, including Drs. Franklin and Allen. The trial court granted summary judgment in favor of the defendants. Sneed appealed to the Court of Appeals, which affirmed the trial court. After a thorough review, we affirm.

# I. BACKGROUND

On August 1, 2013, Sneed was admitted to the Labor and Delivery Unit of the Hospital. Early the next morning, she gave birth to her daughter by vacuum-assisted vaginal delivery under the care of obstetrician/gynecologist Dr. Franklin and medical resident Dr. Allen. Dr. Franklin was a faculty member at the University of Louisville's medical school. Dr. Allen was a resident physician at the University of Louisville's medical residency program. During delivery, Sneed suffered a fourth-degree laceration, the most severe category of vaginal tears, typically characterized by a tear that extends completely into the rectum. Immediately after delivery, Drs. Franklin and Allen sutured the laceration. They had no further interaction with Sneed after August 2, 2013. Sneed was discharged from the Hospital on August 4, 2013.

On August 9 and August 12, 2013, Sneed returned to the Hospital complaining of stool coming out of her vagina. She was cleaned, treated, and sent home both times. On August 13, 2013, Sneed again returned to the Hospital with the same complaint. This time she was admitted and diagnosed with a rectovaginal fistula, which is an abnormal tract or connection between the rectum and vagina. She was treated by Dr. Vernon Cook who removed the sutures and packed the area. He explained to Sneed that there was a small hole where Drs. Franklin and Allen had missed a stitch when suturing her immediately after child birth. During this admission, Sneed's sister spoke directly to Dr. Allen, who confirmed that she and Dr. Franklin delivered the child and repaired the laceration. Sneed was in the same room during this

2

conversation. Also during this admission, Nurse Pam (otherwise unidentified) was critical of the care provided by Drs. Franklin and Allen and expressed her concerns to Sneed. Before being discharged on August 21, 2013, Sneed met with Dr. Sean Francis, a female reconstructive specialist. Dr. Francis was also very critical of the care provided by Drs. Franklin and Allen. Dr. Francis ultimately performed permanent reconstructive surgery on Sneed on October 9, 2013.

On August 1, 2014, Sneed filed suit in Jefferson Circuit Court against the Hospital, Dr. Ali Azadi,[1] unknown nurses, and unknown doctors. On October 20, 2014, over one year and two months after she gave birth, Sneed filed a First Amended Complaint, naming Drs. Franklin and Allen as defendants. On October 30, 2014, Drs. Franklin and Allen filed a motion for summary judgment, arguing the claims against them were time-barred under Kentucky Revised Statute ("KRS") 413.140(1)(e). Sneed argued that the statute of limitations was tolled by the continuous treatment doctrine and the fraudulent concealment of her medical records which delayed her discovery of the doctors who delivered her baby. On February 19, 2016, the trial court granted partial summary judgment in favor of Drs. Franklin and Allen, dismissing all claims against them.

Thereafter, Sneed filed her expert disclosures as required by Kentucky Rule of Civil Procedure ("CR") 26.02. Neither of Sneed's two experts alleged a

---

[1] Dr. Azadi played a limited role in Sneed's care, and he was subsequently dismissed from the lawsuit by agreed order.

3

breach in the standard of care by the Hospital, but only opined on a breach of the standard of care by the "physicians treating Ms. Sneed." By this time, the Hospital was the sole remaining defendant,[2] and it filed a motion for summary judgment. The trial court granted summary judgment in favor of the Hospital, finding that the individual physicians were not employees or agents of the Hospital, and therefore the Hospital was not vicariously liable for their actions.

Sneed appealed the trial court's dismissal of her claims against the Hospital and Drs. Franklin and Allen to the Court of Appeals. The Court of Appeals affirmed. Sneed then appealed to this Court. Additional facts will be discussed as necessary for our analysis.

## II. STANDARD OF REVIEW

To determine if the trial court erred in granting summary judgment, we must consider whether the trial court correctly found that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56.03; *see also Pearson ex rel. Trent v. Nat'l Feeding Sys., Inc.*, 90 S.W.3d 46, 49 (Ky. 2002). Summary judgment is only proper when "it would be impossible for the respondent to produce any evidence at the trial warranting a judgment in his favor." *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 480 (Ky. 1991). However, "'impossible' is used in a practical sense, not in an absolute sense." *Perkins v.*

---

[2] Throughout the duration of the litigation in the trial court, various other doctors and nurses were named as defendants. All other individuals were dismissed by agreed order.

4

*Hausladen*, 828 S.W.2d 652, 654 (Ky. 1992). In ruling on a motion for summary judgment, the Court is required to construe the record "in a light most favorable to the party opposing the motion for summary judgment and all doubts are to be resolved in his favor." *Steelvest, Inc.*, 807 S.W.2d at 480. We review de novo the trial court's grant or denial of a motion for summary judgment. *Caniff v. CSX Transp., Inc.*, 438 S.W.3d 368, 372 (Ky. 2014) (citation omitted).

## III.    ANALYSIS

The case before us presents two main issues. The first is whether Sneed's claims against Drs. Franklin and Allen were time-barred, and therefore appropriate for summary judgment. Sneed argues that both the continuous treatment doctrine and the defendants' fraudulent concealment of her medical records tolled the statute of limitations as to Drs. Franklin and Allen. The second issue is whether Sneed's treating physicians were ostensible agents of the Hospital, making the Hospital vicariously liable for their actions. We will discuss each issue in turn.

### A. Statute of Limitations

Pursuant to KRS 413.140(1)(e), any action against a physician or hospital alleging negligence or malpractice must be "commenced within one (1) year after the cause of action accrued." Further, "the cause of action shall be deemed to accrue at the time the injury is first discovered or in the exercise of reasonable care should have been discovered." KRS 413.140(2). Neither party disputes that one year is the appropriate statute of limitations for the claims in

5

this case. However, the parties disagree about when Sneed's cause of action

accrued and whether the one-year statute of limitations was tolled.

We have previously explained:

> "[T]he statute begins to run on the date of the discovery of the
> injury, or from the date it should, in the exercise of ordinary care
> and diligence, have been discovered." [*Hackworth v. Hart*, 474
> S.W.2d 377, 379 (Ky. 1971).] This rule entails knowledge that a
> plaintiff has a basis for a claim before the statute of limitations
> begins to run. The knowledge necessary to trigger the statute is
> two-pronged; one must know: (1) he has been wronged; and, (2) by
> whom the wrong has been committed. *Drake v. B.F. Goodrich Co.*,
> 782 F.2d 638, 641 (6th Cir.1986). *See also Hazel v. General Motors
> Corp.*, 863 F.Supp. 435, 438 (W.D.Ky.1994) ("Under the 'discovery
> rule,' a cause of action will not accrue until the plaintiff discovers,
> or in the exercise of reasonable diligence should have discovered,
> not only that he has been injured but also that his injury may have
> been caused by the defendant's conduct.").

*Wiseman v. Alliant Hosps., Inc.*, 37 S.W.3d 709, 712 (Ky. 2000).

### 1. Continuous Treatment Doctrine

Sneed argues that the continuous treatment doctrine, as espoused in

*Harrison v. Valentini*, 184 S.W.3d 521 (Ky. 2005), tolled the running of the

statute of limitations, specifically as it pertains to her claims against Drs.

Franklin and Allen. "Under this doctrine, the statute of limitations is tolled as

long as the patient is under the continuing care of the physician for the injury

caused by the negligent act or omission." *Id.* at 524 (footnote omitted). She

urges this Court to expand our continuous treatment doctrine to include

situations when a patient continues to receive care at the same hospital but

not by the same physician. We decline to do so.

6

The continuous treatment doctrine has been used to alleviate concerns with the so-called "discovery rule" whereby a patient must file suit within one year of her "discovery of the injury." *See Wiseman*, 37 S.W.3d at 712 (explaining the discovery rule). As we explained in *Harrison*,

> [The discovery rule] is problematic because often the patient cannot know whether the undesirable outcome is simply an unfortunate result of proficient medical care or whether it is the consequence of substandard treatment. Thus, a patient is left to speculate about the cause of the problem.
>
> Moreover, neither the discovery rule nor KRS 413.190 affords the physician and patient an opportunity to significantly cooperate with each other to improve the initial results or mitigate the damages caused by the poor treatment. Rather the patient is required to file suit immediately to avoid the risk of his suit being time-barred. Such a requirement operates to undermine rather than bolster the relationship of trust and confidence that a patient should be able to have with his or her physician.

184 S.W.3d at 524 (footnotes omitted).

> We further acknowledged that:
>
> [o]ne who possesses no medical knowledge should not be held responsible for discovering an injury based on the wrongful act of a physician. The nature of the tort and the character of the injury usually require reliance on what the patient is told by the physician or surgeon. The fiduciary relationship between the parties grants a patient the right to rely on the physician's knowledge and skill.

*Id.* at 525 (quoting *Wiseman*, 37 S.W.3d at 712-13). Moreover,

> It is entirely logical that the patient's right of reliance extends throughout his treatment with the physician. While treatment continues, the patient's ability to make an informed judgment as to negligent treatment is impaired. Under such circumstances, it can scarcely be said that discovery has occurred. Accordingly, a continuing course of treatment has the effect of preventing discovery of a character necessary to commence the running of the statute of limitations.

*Id.* (citation omitted).

We do not believe that the rationale behind the continuous treatment doctrine would be served by expanding the doctrine in the way that Sneed urges. Expanding the doctrine to include treatment by any physician at the Hospital does not serve to "bolster the relationship of trust and confidence" that a patient has with a particular treating physician at the Hospital. The type of relationship between a patient and the Hospital, or all physicians at the Hospital, is different in kind and degree than the relationship between a patient and a single treating physician. A patient's "ability to make an informed judgment as to the negligent treatment" is not so impaired by her relationship with the Hospital itself to prevent her from discovering her injury. It, therefore, does not justify expansion of the doctrine under the facts of this case.

Sneed points us to cases from various other jurisdictions that have expanded the continuous treatment doctrine past the individual treating physician. However, the facts of those cases are distinguishable, and the rationale behind the expansions are simply not present in this case. For example, in *Watkins v. Fromm*, an appellate court in New York held that the continuous treatment rule may be applied to a patient who was treated by multiple physicians in the same medical group. 488 N.Y.S.2d 768 (N.Y. App. Div. 1985). In that case, however, the patient "was considered to be a patient of the entire medical group, rather than of any one of the individual doctors." *Id.* at 770. The court noted that "it was the practice of the defendant doctors to discuss, as a group, the diagnosis and treatment of all of the patients under

their care." *Id.* Further, the court found that "[t]he continuity of treatment by the remaining members of the group, who were familiar with [the patient's] condition, afforded the group an opportunity to utilize their firsthand knowledge of [the patient's] condition and medical history to correct or ameliorate any errors made at an earlier stage of the treatment." *Id.* at 774. These facts directly support the rationale behind the continuous treatment doctrine.

Those same facts, however, are not present in Sneed's case. No evidence was offered that any of the doctors who participated in Sneed's treatment subsequent to the birth of her child discussed her care with Drs. Franklin or Allen. Further, those doctors had no first-hand knowledge of her delivery, laceration, and repair; they merely relied on her medical records for information about the treatment previously provided to her by Drs. Franklin and Allen. Although it appears that most, if not all of the physicians who treated Sneed were members of one large medical group, University of Louisville Physicians, this medical group is composed of over seven hundred physicians with over seventy specialties. Although some of the treating physicians consulted each other, there was no evidence that she was considered "a patient of the medical group" where all of the members participated in her treatment.

Sneed also argues that a denial of the application of the continuous treatment doctrine to her violates her right to equal protection under the Fourteenth Amendment to the United States Constitution. She argues that as

an indigent person on Medicaid, she was limited to receiving treatment at the Hospital and therefore could not consult with another physician. This argument, however, was never raised to the trial court, and therefore was not preserved for our review. This Court has stated on numerous occasions that "appellants will not be permitted to feed one can of worms to the trial judge and another to the appellate court." *Kennedy v. Commonwealth*, 544 S.W.2d 219, 222 (Ky. 1976), *overruled on other grounds by Wilburn v. Commonwealth*, 312 S.W.3d 321 (Ky. 2010). We have also previously said that "[a] new theory of error cannot be raised for the first time on appeal." *Springer v. Commonwealth*, 998 S.W.2d 439, 446 (Ky. 1999). *See also Young v. Commonwealth*, 50 S.W.3d 148, 168 (Ky. 2001) ("Error is not preserved if the wrong reason is stated for the objection."). Therefore, we decline to address this argument.

In conclusion, we decline to extend our continuous treatment doctrine to the facts of this case and hold that it did not toll the statute of limitations for the claims against Drs. Franklin and Allen.

## 2. Concealment of Medical Records

Sneed next argues that there were genuine issues of material fact as to whether the Hospital and Drs. Franklin and Allen concealed her medical records such that the statute of limitations was tolled. KRS 413.190(2) states as follows:

> When a cause of action mentioned in KRS 413.090 to 413.160 accrues against a resident of this state, and he by absconding or concealing himself or by any other indirect means obstructs the prosecution of the action, the time of the continuance of the absence from the state or obstruction shall not be computed as any part of the period within which the action shall be commenced.

10

> But this saving shall not prevent the limitation from operating in favor of any other person not so acting, whether he is a necessary party to the action or not.

Sneed argues that she requested her medical records from the Hospital three different times, and it was only after the third request that the medical records were provided to her, approximately one year and two weeks after she gave birth. The record from the trial court indicates that Sneed first requested her medical records from the Hospital on April 2, 2014. That request was received by the Hospital on April 4, 2014. Yet, Sneed's records were not provided to her until August 15, 2014 with no intervening response from the Hospital.

Sneed further asserts that when she received her medical records, she received thousands[3] of pages that were in no meaningful order, and that the substance of the documents was conflicting and omitted key information related to her treatment. We pause here to remind the Hospital of its obligation under 45 C.F.R.[4] 164.524(b)(2) to act on a request for records within thirty days of receipt. A delay of over four months, as occurred in this case, is unacceptable. Neither is it acceptable if the large amount of medical records, when finally provided, were in disarray or lacked any meaningful organization.

Regarding the content of the medical records, Sneed claims specifically that the nurses' notes from the delivery did not mention the laceration repair

---

[3] Sneed claims in her Appellant brief that "several thousand pages of records were sent in no organized fashion." However, the Certification of medical records from the Hospital which was attached to Sneed's response to the physicians' summary judgment motion at the trial court level stated that the medical record consisted of 938 pages.

[4] Code of Federal Regulations.

and that on the Delivery Note Dr. Franklin is listed as the attending physician while Dr. Azadi is listed as the attending physician on the Discharge Summary. While it is accurate that the Ante-Intrapartum Flowsheet, which we presume are the nurses' notes she references, does not document Sneed's laceration or repair, it includes very few details of the delivery. However, both the Delivery Note and Sneed's Discharge Summary document the laceration and repair in detail. Although these two documents note different attending physicians, that is not uncommon, as a patient's attending physician may be different from day to day during a single hospital admission.

Finally, Sneed complains about the answers to interrogatories and requests for production of documents filed in the trial court by the various defendants. She notes that the defendants relied on their attorneys to draft the answers and, other than Dr. Allen, failed to disclose the morbidity and mortality ("M&M") report prepared by Dr. Allen. Sneed argues the M&M report was essential because she did not know she had a cognizable claim, in that she knew she was harmed, but did not know she was injured under *Wiseman* until she received that report. *See* 37 S.W.3d at 712 (distinguishing between "harm" and "injury" in the medical malpractice context). As explained below, however, we do not find this argument persuasive.

In summary, Sneed argues that given all of her allegations, genuine issues of material fact existed regarding the defendant's fraudulent concealment so that summary judgment was not appropriate.

12

The purpose of the equitable tolling of the statute of limitations due to fraudulent concealment is to prevent a defendant from concealing the plaintiff's cause of action. We acknowledge that "where the law imposes a duty of disclosure, a failure of disclosure may constitute concealment under KRS 413.190(2), or at least amount to misleading or obstructive conduct," *Munday v. Mayfair Diagnostic Laboratory*, 831 S.W.2d 912, 915 (Ky. 1992); however, it is clear from the record that Sneed was well aware of her cause of action prior to the running of the statute of limitations even without receiving her medical records.

Sneed's undisputed deposition testimony revealed that she was aware no later than August 21, 2013 that she suffered a rectovaginal fistula as a result of Drs. Allen and Franklin "missing a stitch" during their repair of her fourth-degree laceration. This information was given to her by Dr. Cook, Nurse Pam, and Dr. Francis, who were all critical of the treatment provided to her by Drs. Franklin and Allen. Further, during her admission to the Hospital that extended from August 13 to August 21, 2013, Dr. Allen spoke to Sneed's sister, with Sneed present in the room, and acknowledged that it was she and Dr. Franklin who delivered Sneed's baby and performed the initial repair of the laceration. Therefore, the issue of whether the defendants in this case concealed information has no bearing on the running of the statute of limitations as Sneed possessed all of the necessary knowledge to file a claim without any of the allegedly concealed information.

Because the statute of limitations was not tolled by either the continuous treatment doctrine or the fraudulent concealment doctrine, the trial court did not err in granting summary judgment in favor of Drs. Franklin and Allen. Therefore, we affirm the Court of Appeals on this issue.

## B. Ostensible Agency

Sneed's final argument that we must address is that the Hospital is vicariously liable for the actions of Drs. Franklin and Allen because Drs. Franklin and Allen were ostensible agents of the Hospital.[5] She argues that genuine issues of material fact existed such that the trial court erred in granting summary judgment in favor of the Hospital.

Sneed argues that both Dr. Franklin and Dr. Allen "presented themselves as agents of the Hospital based on their acts and conduct." Sneed argues that she believed Drs. Franklin and Allen were employees of the Hospital based on how *the doctors* presented themselves. She noted that both doctors wore medical scrubs and name badges. Dr. Allen's badge read "Resident Physician" and Dr. Franklin's badge read "University of Louisville" and contained her name and the designation "M.D." Sneed also argues that on the date of her admission for her delivery, she signed consent forms consenting to treatment by members of the Hospital's staff and did not consent to treatment by

---

[5] Sneed cites to cases and appears to also argue that the doctors were actual agents of the Hospital. However, the question of law as presented in her Motion for Discretionary Review to this Court was whether the doctors were *ostensible* agents of the Hospital. Therefore, any argument about actual agency is not properly before this Court, and we will not address it.

14

independent contractors. She further notes that she was not presented with consent forms specifically from Dr. Franklin or Dr. Allen. Sneed also claims that she did not understand the forms she signed and did not understand that they were applicable to her. Finally, Sneed argues that the consent forms she signed were ambiguous and therefore should be interpreted against the drafter, or in the alternative, that the unambiguous language should be strictly construed with the words given their ordinary meaning.

The Hospital, on the other hand, argues that neither Dr. Franklin nor Dr. Allen were employed by the Hospital and that the Hospital notified its patients of that through its consent forms signed prior to admission. These consent forms, the Hospital argues, were sufficient to justify the trial court's granting of summary judgment in its favor.

It is uncontested that on March 24, 2013 and June 13, 2013, Sneed signed a two-page form titled "Consents/Acknowledgements." Paragraph IV of this form is titled "Recognition of Independent Contractors." This paragraph reads as follows:

> Physicians are not hospital employees and the hospital is not responsible for the actions of physicians. I understand and agree that I may require the services of physicians or groups of physicians who are not hospital employees, including emergency room physicians, radiologists, pathologists, anesthesiologists, etc., who bill and collect independently for their services. I understand that their bills will be separate and apart from the hospital's billing and collections, or that the hospital may bill me on the physicians' behalf, but subject to the authorizations granted by me in accordance with paragraphs VI and VII.

It also is not disputed that Sneed did *not* sign this same form on her August 1, 2013 admission to the Hospital. However, on June 13, 2013, in addition to the

15

above-referenced form, Sneed also signed a form titled "Consent for Semi-

Annual Signatures." The substantive content[6] of that form is as follows:

> Permission to Use Semi-Annual Signatures
> I grant permission to the University of Louisville Hospital to use today's signatures on the following forms for outpatient services I receive for six (six) [sic] months from today's date. I understand this permission commits me to abide by the terms of each form for the following year.
>
> o Consent for Medical Treatment
> o Conditions of Admission/Treatment
> o Medicare Secondary Payor Information
>
> Information Changes
> I will inform University of Louisville Hospital's staff in person or call 502-562-4960 if any information regarding payment for my care changes, for example: address, employment, insurance, Medicare, or Medicaid.
>
> Inpatient Services
> Most insurance companies and other payors require the hospital to bill separately for inpatient and all types of surgical services. Today's signatures will be used if I am admitted or receive outpatient services in the next six (6) months.
>
> Questions About Your Bill
> Questions regarding your bill should be directed to the Hospital's Billing Office at 502-562-3226 between the hours of 9:00 a.m. and 4:00 p.m.

Sneed argues that because she did not sign the consent form that specifically addressed the independent contractor status of the physicians on the date she was admitted to deliver her baby, she was not on notice that independent contractor physicians would be treating her during that

---

[6] A section requesting information about the patient's health insurance and the signature block have been omitted.

16

admission. She further argues that the Consent for Semi-Annual Signatures form was only applicable for outpatient treatments for six months. The Hospital, on the other hand, argues that Sneed's June 13, 2013 signatures on the Consent for Semi-Annual Signatures form and the Consents/Authorizations form provided notice to her that independent contractors would treat her for at least the next six months, including her August 1, 2013 admission.

This Court's seminal case addressing ostensible agency in the hospital setting is *Paintsville Hospital Company v. Rose*, 683 S.W.2d 255 (Ky. 1985). In that case, quoting *Middleton v. Frances*, 77 S.W.2d 425, 426 (Ky. 1934), we stated:

> An apparent or ostensible agent is one whom the principal, either intentionally or by want of ordinary care, induces third persons to believe to be his agent, although he has not, either expressly or by implication, conferred authority upon him.

*Paintsville Hosp.*, 683 S.W.2d at 257. We further explained the principle of ostensible agency when we stated,

> One who represents that another is his servant or other agent and thereby causes a third person justifiably to rely upon the care or skill of such apparent agent is subject to liability to the third person for harm caused by the lack of care or skill of the one appearing to be a servant or other agent as if he were such.

*Id.* (quoting RESTATEMENT (SECOND) OF AGENCY § 267 (1958)).

In reviewing claims of ostensible agency, "[t]he burden of proving agency is on the party alleging its existence." *Wright v. Sullivan Payne Co.*, 839 S.W.2d 250, 253 (Ky. 1992) (citing *Cincinnati Ins. Co. v. Clary*, 435 S.W.2d 88 (Ky.

1968)). Further, "manifestations of the principal to the other party to the transaction are interpreted in light of what the other party knows or should know instead of what the agent knows or should know." *Paintsville Hosp.*, 683 S.W.2d at 257 (quoting RESTATEMENT (SECOND) OF AGENCY § 49 (1958)).

In *Paintsville Hospital*, we held that "it is unreasonable to put a duty on the patient to inquire of each person who treats him whether he is an employee or independent contractor of the hospital." *Id.* at 258 (citing *Grewe v. Mt. Clemens Gen. Hosp.*, 273 N.W.2d 429 (Mich. 1978)). We then cited with approval to a case from New Jersey to aid us in interpreting ostensible agency.

> **Absent notice to the contrary**, therefore, plaintiff had the right to assume that the treatment received was being rendered through hospital employees and that any negligence associated with that treatment would render the hospital responsible.

*Id.* (emphasis added) (quoting *Arthur v. St. Peters Hosp.*, 405 A.2d 443, 447 (N.J. Super. Ct. Law Div. 1979)).

While this Court has yet to consider what type of notice is necessary to constitute "notice to the contrary," the Court of Appeals did so in *Floyd v. Humana of Virginia, Inc.*, 787 S.W.2d 267 (Ky. App. 1989). In that case, the Court of Appeals held that testimony by the patient that she had read and signed each of the hospital's admission forms, including one which specifically indicated that the doctors who treated her were independent contractors and not agents of the hospital, was sufficient to defeat the patient's claim of ostensible agency. *Id.* at 270. That court further noted that there was "no

18

representation or other action to induce [the patient] to believe that the physicians were employees or agents of [the hospital]." *Id.*

The United States Sixth Circuit Court of Appeals also addressed the question of ostensible agency in the context of physicians providing treatment at a hospital in *Roberts v. Galen of Virginia Inc.*, 111 F.3d 405 (6th Cir. 1997), *reversed on other grounds in Roberts v. Galen of Virginia, Inc.*, 525 U.S. 249 (1999). In that case, the hospital overtly represented that its physicians were not its agents, but the patient did not see or acknowledge the disclaimer, presumably because she was physically unable to do so. *Id.* at 413.

The Sixth Circuit Court of Appeals undertook an extensive review of Kentucky caselaw on this issue, including both *Paintsville Hospital* and *Floyd*, as well as *Williams v. St. Claire Medical Center*, 657 S.W.2d 590 (Ky. App. 1983), and concluded that the result "turn[s] on whether the hospital holds its physicians out to be employees or something else." *Roberts*, 111 F.3d at 413. That court went on to quote from *Williams* stating, "[i]t is a matter of appearances, fairly chargeable to the principal and by which persons dealt with are **deceived**, and on which they rely." *Id.* (emphasis added). Finally, the court concluded,

> under Kentucky law the actions of the hospital, rather than the knowledge of the patient, is controlling in a case where the patient is unable to obtain actual knowledge of the hospital's disclaimer. Here, Humana clearly **attempted to** alert the public that its physicians were not employees or agents of the hospital. The District Court, therefore, properly concluded that the surgical residents were not ostensible agents of the hospital.

*Id.* (emphasis added).

19

In the case before us today, the Hospital clearly attempted to alert its patients that the physicians who provided treatment at the Hospital were not employees of the Hospital. It did this first through its Consents/Acknowledgments form that Sneed signed on both March 24, 2013 and June 13, 2013. It also attempted to do so through its Consent for Semi-Annual Signatures form that Sneed signed on June 13, 2013, which purported to provide consent for the Hospital to use the patient's signature on certain forms for the next six months. We acknowledge, as did the Court of Appeals, that the language of the Hospital's Consent for Semi-Annual Signatures form could have been clearer. That form could have more obviously stated that it pertained to both outpatient visits to the hospital as well as inpatient admissions. Further, it could have specifically stated that the patient's signature would be used on the Consents/Acknowledgment form.

However, despite these potential ambiguities, we conclude that the Hospital took reasonable steps to notify patients that they would be treated by independent contractor physicians. We see no evidence of any intent of the Hospital to deceive its patients into believing that the physicians were employees of the Hospital, nor do we see evidence of the Hospital holding the physicians out to be employees. Therefore, we hold that no genuine issue of material fact existed as to whether Drs. Franklin and Allen were ostensible agents of the Hospital. As such, we affirm the lower courts in dismissing the claims against the Hospital.

## IV. CONCLUSION

For the foregoing reasons, we affirm the decision of the Court of Appeals.

All sitting. All concur.

COUNSEL FOR APPELLANT, JASSICA SNEED:

Nader George Shunnarah
Louisville, KY

COUNSEL FOR APPELLEES, UNIVERSITY OF LOUISVILLE HOSPITAL; DR. TANYA FRANKLIN; AND DR. JENNIFER FORD ALLEN:

David Bryan Gazak
Daniel Garland Brown
Madeline Olivia Moss
Gazak Brown, P.S.C.

COUNSEL FOR AMICI CURIAE, THE AMERICAN MEDICAL ASSOCIATION AND THE KENTUCKY MEDICAL ASSOCIATION:

Bethany A. Breetz
Sarah Spurlock
Stites & Harbison, PLLC

Philip Seth Goldberg
Shook, Hardy & Bacon, LLP